By the Review PaNel : When S. 881,91st Cong., 1st Sess., was referred by Senate Resolution 98 of the same Congress to the Chief Commissioner of the Court of Claims pursuant to 28 TJ.S.'C. § 1492, the Chief Commissioner designated Trial Commissioner Harry E. Wood to conduct the initial proceedings in this case under the provisions of 28 U.S.C. § 2509. After holding a trial and receiving requested findings of fact and briefs from the parties, Commissioner Wood filed a report that contained a carefully prepared opinion, exhaustive and accurate findings of fact, and ultimate findings and conclusions. Exceptions were taken by the plaintiff to certain matters set out in Commissioner Wood’s report; and, after the briefing procedures were completed, the parties on January 24, 1972, made oral arguments to the Review Panel on the exceptions.
The Review Panel has adopted a large part of Commissioner Wood’s opinion and all of his findings of fact (except for two statements of a conclusional nature). However, the Review Panel has decided that the facts warrant a conclusion different from that reached by Commissioner Wood on the crucial issue in the case.
This congressional reference originated in the failure, between 1943 and 1945, of three Navy “panels” and one “administrative board” to select the plaintiff, a 1924 Naval Academy graduate then serving on active duty as a commander, for temporary promotion to the grade of captain.
£>. 881, 91st Cong., 1st Sess., was entitled “A bill for the relief of Commander Edward White Rawlins.” It was referred by Senate Resolution 96 of the same Congress to the Chief Commissioner of the Court of Claims for “findings of *976 fact and conclusions tbereon as shall 'be sufficient to inform the Congress (a) of the nature and character of his demand, as a claim legal or equitable, against the United States, (b) whether Commander Bawlins suffered non-promotion to the grade of captain as a probable consequence of any arbitrary, capricious, inadvertent, improper, inequitable, or wrongful act or action or combinations thereof by or within the Department of the Navy, and (c) in such event, the amount legally or equitably due from the United States to the claimant, notwithstanding the lapse of time and any statute of 'limitations or laches.”
The congressional reference calls for scrutiny of events now long past. The plaintiff’s strenuous and persistent efforts to secure administrative or legislative redress for his failure to be promoted to the grade of captain alone span nearly a quarter of a century. The accompanying findings of fact' detail fully the long and complex case history. To avoid unnecessary duplication, only those facts essential to an understanding and evaluation of the plaintiff’s claim will be summarized in the opinion.
I — Factual Summary
A. The 19S9 Gorrespondence
On March 1, 1939, attorneys for the plaintiff’s then wife sent a letter to the Navy Department, implying that the plaintiff was in receipt of unwarranted dependency allowances. The plaintiff, then a lieutenant, was directed to, and in April 1939 did, respond. He denied any impropriety, and supported the denial with a copy of a 1938 state court decree dismissing his wife’s action for divorce and stating that the equities of the divorce action were with the plaintiff. Ultimately, however, the plaintiff’s pay account was checked because of an alleged overpayment of dependency allowances. The plaintiff then sued to recover the amount of the checkage, and won. Rawlins v. United States, 93 Ct. Cl. 231 (1941).
The March 1,1939, letter remained in the plaintiff’s personnel file at all times here relevant. In 1949, the plaintiff’s *977 response was found to be missing from his file,[1] and it is reasonable to infer that the response was not in the file at any time between 1939 and 1950.
B. Admiral Bramará’s Fitness Report
From March 1941 to February 27,1943, the plaintiff served as force communication officer, Task Force Twenty-Four, U.S. Atlantic Fleet. During such service, he was, on August 20, 1942, promoted to commander (temporary).
Until April 20, 1942, Vice Admiral A. L. Bristol served as Task Force Commander. Admiral Bristol’s chief of staff was Captain (later Admiral ) Robert B. Carney.[2] After Admiral Bristol’s sudden death on April 20, 1942, Vice Admiral R. M. Brainard assumed command. Admiral Carney continued to serve as chief of staff irntil September 30,1942, when he was detached. Captain (later Rear Admiral) E. T. Wooldridge, who had been operations officer prior to September 30,1942, then became chief of staff.
In 1942 and thereafter until sometime in 1945, the fitness reports of naval officers reflected (among other things) numerical ratings on a scale of 0 to a maximum rating of 4.0 and rating choices of outstanding, above average, average, and below average.[3] During the war period, the practice of giving officers practically perfect ratings was prevalent, and ratings in the 3.5-3.6 range were average, not outstanding.
The plaintiff’s last fitness report as a lieutenant commander (prepared by Admiral Carney) covered the period from August 9, 1941, to April 20, 1942, and reflected numerical ratings slightly above the median rating (nearly 3.8) derived from all of the plaintiff’s fitness reports in the grade of lieutenant commander. The plaintiff was deemed outstand *978 ing, and the Task Force Commander’s attitude toward having the plaintiff under his command was the highest of four possible ones, “Particularly desire to have him.” It was, in Admiral Carney’s words, “a send-off * * * good enough to entitle him to a wartime promotion by a very safe margin.”
In Admiral Carney’s view, the plaintiff’s service between April 21, 1942, and Admiral Carney’s detachment on September 30, 1942, remained outstanding. The plaintiff’s first fitness report following his temporary promotion to commander, signed by Admiral Brainard and covering the period from April 21,1942, to February 27,1943, was, however, a far ciy from his last one as a lieutenant commander. While noting that the plaintiff had been commended on January 29,1943, by the Commander, Greenland Patrol, for initiative and energy in connection with work done on the Joint Army-Navy Plan for the Defense of Greenland, it plainly was a mediocre report. Indeed, it avoided being an unsatisfactory one by a very narrow margin.
More precisely, Admiral Brainard rated the plaintiff 3.0 in his present assignment, 2.8 as executive or division officer, and 2.8 in administration; rated him as average (the next-to-lowest of five available choices) in comparison with other officers of the plaintiff’s rank and service; and stated that the Task Force Commander would “Be satisfied to have him,” the third lowest of four possible attitudes. Admiral Brain-ard’s remarks concerning the plaintiff were these: “An officer of average capability, education and experience. He is conscientious and loyal; a cheerful and genial shipmate.” Markings on force and initiative were just above unsatisfactory, and those on several other factors (including cooperation, judgment, and leadership) were only slightly higher.[4]
C. Admiral Beary’s Fitness Reports
From March 21,1943, to June 24,1944, the plaintiff served as force communication officer, Fleet Operational Training *979 Command, U.S. Atlantic Fleet, under Rear Admiral D. B. Beary.[5]
On a fitness report covering the period from March. 21, 1943, to March 31, 1944, Admiral Beary rated the plaintiff 3.7 in his present assignment and 3.5 in ability to command, and above average in comparison with other officers of his. rank and service. Admiral Beary stated that he would “Be satisfied” to have the plaintiff under his command, and remarked that the plaintiff “is a quiet, unassuming officer of pleasing personality who has concerned himself with communication duties and performs them in a satisfactory manner.”
On a report covering the period from April 1 to June 24, 1944, Admiral Beary indicated that he would “Be pleased” to have the plaintiff under his command, and remarked that the plaintiff “is an officer of wide experience in communications, in which he is most capable. His communications ideas and methods are sound and practical. Pie has a pleasing personality and cooperates readily.” The plaintiff was again rated 3.7 in present assignment and 3.5 in ability to command, and above average.
Neither report contained a recommendation'concerning the plaintiff’s fitness for promotion to captain. On May 18,1949, Admiral Beary, having been apprised of this, advised the Secretary of the Navy that it was due to “oversight,” and stated that: “I considered him fit for promotion at the time and still do. It is requested that the following sentence be added to my remarks under paragraph 14 of each report: Well fitted and strongly recommended for promotion to the rank of Captain.’ ”
D. The Navy’s ’Wartime amd Postwar Promotion Systems
About June 1942, the Navy Department initiated a “panel” system (see finding 6(c)) in effecting temporary promotions to the grade of commander[6] and captain. The system, de *980 scribed below, represented the Navy Department’s endeavor, within the limitations imposed by war, to adhere generally to the principle of promotion by selection.
Briefly, and in general terms, a “panel” of senior officers, some perhaps then serving overseas, was selected by the Secretary. Each panel member received a list of names of, c.y., commanders, and a memorandum asking him to aid the Secretary in the task of nominating a stated (approximate) number for temporary promotion to the grade of captain by informal but definite checking on the list of names. Overseas panel members were “authorized to confer with senior officers in the area as desired in making your selections.” Other panel members were advised that the records of all officers on the list would be made available to them. Lists were subsequently returned to the 'Secretary, “votes” were tabulated, and a list of those nominated or “selected” was prepared and submitted to the President. While the only stated criterion for checking a name was “qualified for temporary promotion,” an individual panel member’s deliberations necessarily involved an element of comparative evaluation.
At the close of 1945, the Navy utilized at least one “administrative board” in effecting promotions. That board, consisting of some 15 members (eight Regular Navy and seven Naval Reserve officers), considered commanders for temporary promotion to the grade of captain. Members of the board, which convened in Washington, D.C., were furnished the names and records of officers (Regular and Reserve) eligible for temporary promotion to the grade of captain, and were instructed to recommend for such promotion “only those officers who are considered qualified to 'assume the responsibilities of the higher rank.”
Following August 7, 1947, the date of enactment of the Officer Personnel Act of 1947, 61 Stat. 795, as amended, promotions in the Regular Navy to the grade of captain were made under the provisions of that Act. Insofar as the Navy was concerned, it in effect rcinstituted the pre-1942 Navy system of promotion upon selection by a statutory selection board.
*981 E. Plaintiff’s Failures of 8election for Promotion to the Grade of Captain
1. The wartime panels.
The plaintiff, along with other line commanders, was considered for temporary promotion to the grade of captain by three “panels” of the sort described generally hereinabove. Panel dates, and the approximate number of commanders to be nominated by each panel, appear below:

Number to be nominated

Date:
Aug.-Nov. 1943 _ 200
June-Aug. 1944 _ 500
Jan.-Apr. 1945 _ 426
The record does not disclose with any certainty either the number of commanders considered for temporary promotion by any of these panels, or the panel vote on plaintiff.[7] Plaintiff was not selected or nominated for such promotion by any of the panels.
Not every member of all panels saw plaintiff’s personnel file. Some, at least in 1943, were overseas, and overseas panel members received no personnel files. Those who did see plaintiff’s file, however, obviously did not see his response to the letter of March 1,1939 (part I A, supra), Admiral Brainard’s letter of November 20, 1948 (part I B, supra), or Admiral Beary’s letter of May 18,1949 (part I C, supra) .[8]
2. The 1945 administrative board.
In November-December 1945, the administrative board described above (part I D, supra) considered, but did not recommend, the plaintiff for temporary promotion to the grade of captain.[9] Like the panels, this board saw neither *982 the plaintiff’s response to the letter of March 1,1939, Admiral Brainard’s 1948 letter, nor Admiral Beary’s 1949 letter.[10]
3. Plaintiff’s 1947 request for promotion.
On June 9, 1947, the plaintiff addressed a lengthy communication to the Secretary of the Navy. In substance, he asked that, for “reasons of equity and justice as supported by the facts set forth” in his letter, he be promoted to the grade of captain, with the “lineal position” he would have occupied had he been selected for temporary promotion to that grade by the 1943 panel.[11]
The plaintiff’s request was denied, in substance on the ground that between 1943 and 1945 four duly constituted selection boards had considered his “name and complete official record”[12] and had failed to recommend him for promotion, and that there was no evidence of unfairness or partiality in the history of the case.
4. The statutory selection boards.
In January 1950, and again in October 1950, the plaintiff was considered for promotion to the grade of captain by a statutory selection board convened pursuant to the Officer Personnel Act of 1947, sufra.
By 1950, a copy of the plaintiff’s 1939 response, and the letters of Admirals Brainard and Beary, were part of the plaintiff’s file. The reasons for his 1950 failures of selection are not stated. He was, however, then handicapped by being-in competition with officers who were, on the average, several years younger than he then was, and with brilliant wartime records. His wartime failures of promotion may also have had an adverse effect on him. In any event, he was not selected for promotion by either of the 1950 boards; and in 1951 he retired on his own application in lieu of mandatory retirement pursuant to the 1947 Act.
5. The special advisory board.
*983 This board, which met in 1961, will be discussed in part I G, infra.
F. The Board for the Correction of Naval Records
There is no evidence as to whether the plaintiff has ever made an application to the Board for the Correction of Naval Records, established pursuant to Section 207, Legislative Reorganization Act of 1946, 60 Stat. 812, 837, as amended, 10 TJ.S.C. § 1552 (1964).[13] The record does show, however, that more than once, and to the plaintiff’s knowledge, others (including Senator Millard F. Tydings in 1948, and Congressman Carl Vinson in 1960) were in substance advised by the Navy that the Board was “not a proper forum for a case of this nature.”
G. The Special Advisory Board
In September 1947, shortly after the rejection of the plaintiff’s request for Secretarial promotion to the grade of captain, he requested, and received, permission to correspond with members of Congress respecting his case. Communications to and from individual members of Congress, and proposed legislation in the plaintiff’s behalf (S. 780, 81st Cong., 1st Sess.; S. 108, 84th Cong., 1st Sess.; and two 1961 House resolutions)[14] are described in the findings.
Just prior to a subcommittee hearing on the 1961 resolutions scheduled for August 2, 1961, the Under Secretary of the Navy advised the plaintiff that, while he was unwilling to agree to consideration of the plaintiff’s case by the Board for the Correction of Naval Records, he would appoint a special advisory board to consider the plaintiff’s record as it stood during the 1943-45 period (corrected to include the plaintiff’s 1939 response) and to recommend to the Under Secretary whether the plaintiff should have been “among those officers recommended for promotion to the grade of *984 captain” by the three 1943-45 panels and the 1945 administrative board.
The plaintiff was advised that, before the Under Secretary would convene the special advisory board, the plaintiff would have to ask for, and agree to abide by the decision of, the board. He was also told that he could neither appear before, nor call witnesses to testify in his behalf before, the board, and that no “new evidence” which the plaintiff had assembled since 1945 could be considered by the board. The plaintiff, believing that he had no reasonable alternative in all the circumstances, acquiesced. He did subsequently ask that Admiral Beary’s letter of May 18, 1949, and a copy of the instructions given to the 1943 panel, be submitted to the board. The request was denied.
On September 19, 1961, the Under Secretary advised the plaintiff that the special advisory board had examined the record and considered the case of every officer whose name was furnished the board by the Chief of Naval Personnel with respect to the 1943-45 panels and board; that the board had concluded that the plaintiff’s promotion by any of these four bodies was “not appropriate”; that he had approved the board’s proceedings and recommendations; and that “the question of your promotion has been resolved against you and it is considered that the matter is closed.”
II — Discussion
The plaintiff contends, in essence, that the Senate should be advised that his failure of promotion to the rank of captain in and after 1943 was a “probable consequence” of the defendant’s arbitrary, capricious, improper, wrongful, inadvertent, or inequitable acts.[15] Defendant controverts this, asserting that there is “no substantial basis upon which it can be concluded that” the plaintiff has a claim for equitable *985 relief, but that, even were such a basis shown, the plaintiff’s 1961 agreement to abide by the special advisory board’s (subsequently adverse) conclusion should preclude any “favorable recommendation” pursuant to Senate Eesolution 96.
A. The Nature of the Qlaim
The plaintiff asserts, essentially -pro forma if with some due process overtones, that his claim is legal in nature, as well as equitable. According to the defendant, however, the plaintiff not only has no legal claim but, on the merits, has no equitable one. The plain concern of Senate Eesolution 96 is not the precise nature of the plaintiff’s claim, but whether his contention of denial of fair and just treatment in the process of consideration for promotion to captain, and resulting deteriment to his naval career, has any substance. Accordingly, with no risk of prejudice to either party, the controversy as to whether the claim is legal in nature may properly and fairly be treated as subsumed within the broader question whether it has any “equitable” basis, as that term is used in 28 TJ.S.C. § 2509.
B. The Question of Estoppel
The defendant’s contention that the plaintiff’s 1961 agreement to abide by the decision of the special advisory board in any event precludes a favorable recommendation must be, and is, rejected.
The special advisory board was not sought by the plaintiff. It was tendered by the Under Secretary, with strings attached, at a time when the plaintiff (1) was scheduled to appear before a subcommittee of the House Armed Services Committee, and (2) had reason, prior to the Under Secretary’s tender, to expect a subcommittee recommendation that his case be considered by the Board for the Correction of Naval Eecords (“BCNE”).
A statement by the Under Secretary to the subcommittee that the Navy had offered the plaintiff an administrative hearing, only to have the offer rejected, might well have concluded any congressional interest in his case.[16] Moreover, the *986 plaintiff had been apprised in 1960, if indirectly, that the Navy Department regarded the BCNR. as “advisory in nature” to the Secretary.[17] Thus, even if the subcommittee still recommended, and the plaintiff received, BCNR consideration with another available administrative remedy unex-hausted, the plaintiff’s fear of the risk of antagonizing the Under Secretary was at least understandable, and at worst quite real. In all the circumstances, the plaintiff was not in a position either to question the preconditions included as part of the offer, or to reject the offer itself.
The offer as made, in addition to demanding advance agreement to abide by the board’s decision, precluded the plaintiff from appearing before the board, or even from submitting any desired evidence of possible error or injustice for its consideration.[18] To bar scrutiny of the merits of a claim in sole i*eliance on an agreement extracted under the circumstances here present would violate that concept of a broad moral sense “based upon general equitable consideration,” long recognized as embodied in Section 2509.[19] Burkhardt v. United States, 118 Ct. Cl. 658, 667, 84 F. Supp. 553, 559 (1949) ; Bennett, Private Claims Acts and Congressional References, 9 AF JAG L. Rev. (No. 6) 9, n. 4 (1967).
Enhancing this conclusion are the further ones that the Navy Department’s repeated refusals to agree to consideration of the plaintiff’s case by the BCNR were indefensible, and that such refusals at least contributed to a denial of rights accorded plaintiff by Section 207 of the Legislative Reorganization Act of 1946, supra,[20] Cf. DeBow v. United *987 States, 193 Ct. Cl. 499, 434 F. 2d 1333 (1970) ; Schmidt v. United States, 192 Ct. Cl. 420, 427 F. 2d 720 (1970) ; Clinton v. United States, 191 Ct. Cl. 604, 423 F. 2d 1367 (1970) ; Oleson v. United States, 172 Ct. Cl. 9 (1965).
It is, of course, true that a hearing before tlie BCNR, at ■which an applicant may personally appear with (or without) counsel and present evidence, is not a matter of right. E.g., Newman v. United States, 185 Ct. Cl. 269 (1968). Necessarily implicit in the statute authorizing a claim of error or injustice in a military or naval record, however, is the right to submit for consideration any and all evidence the applicant may have to support his claim. E.g., Brown v. United States, 195 Ct. Cl. 103 (1971); Proper v. United States, 139 Ct. Cl. 511, 154 F. Supp. 317 (1957).
The 1961 substitute tendered to the plaintiff effectively denied him that right, and the plaintiff’s agreement to abide by the decision of the special advisory board, a precondition to its convening, in no way equitably bars the plaintiff here.
C. The “Non-Promotion to the Grade of Captain”
The central issue, then, is whether the plaintiff “suffered non-promotion to the grade of captain as a probable consequence of any arbitrary, capricious, inadvertent, improper, inequitable, or wrongful act or action or combinations thereof by or within the Department of the Navy.”[21] For reasons which follow, it is concluded that an affirmative answer to this question is warranted.
The record contains no explicit statement of reasons for any of the plaintiff’s failures of selection. An analysis of his claim that the failures were the probable consequence of inadvertence, inequity, or worse, necessarily commences, however, with the Admiral Brainard fitness report covering the period from April 20,1942, to February 27,1943. That report was the initial one on the plaintiff’s service as a commander. It was the last one in the plaintiff’s file when the first, i.e., *988 the 1943, panel failed to recommend him for promotion; and it was a part of the plaintiff’s file at all times thereafter.
Moreover, the 1942-43 report was, admittedly, a “mediocre” one. No panel or board member aware of it would have ignored it. The report was reason enough, in itself, for the plaintiff to be “given * * * a complete brush off * * [22]
There can be, and is, no doubt that it was a large, if not a controlling, factor in the plaintiff’s failure to attain the grade of captain.
Admiral Brainard’s “mediocre” fitness report on the plaintiff for the period from April 20,1942, to February 27,1943, was inconsistent with all the other fitness reports on the plaintiff that were prepared during his service as a lieutenant commander and as a commander up to the time in October 1950 when the plaintiff was given final consideration by a statutory selection board for promotion to the grade of captain. The other reports (see findings 7(d), 10(a), 12(a), 13(c), 15, 17(a), 18, 19, 21, and 26) clearly demonstrate that the plaintiff was an officer of better than average competency in comparison with other officers of his grade.
With respect to the plaintiff’s performance of his duties during the crucial period from April 20,1942, to February 27, 1943, Admiral Carney, who (as a captain) was chief of staff to Admiral Brainard until September 30,1942, evaluated the plaintiff’s work up to that date as outstanding. Eear Admiral Wooldridge, who (as a captain) succeeded Admiral Carney as chief of staff to Admiral Brainard, characterized the plaintiff as an officer of “extremely high military and personal character.” However, the wartime panels and administrative board that considered the plaintiff for promotion to the grade of captain did not have the benefit of Admiral Carney’s evaluation of the plaintiff’s performance during the first part, or of Eear Admiral Wooldridge’s evaluation of the plaintiff’s performance during the remainder, of the crucial period from April 20,1942, to February 27,1943.
Even Admiral Brainard subsequently stated in a letter to

*0

*989 the Secretary of the Navy dated November 20, 1948 — which obviously was not before the wartime panels and administrative board when they considered the plaintiff for promotion to the grade of captain — that he had found the plaintiff “to be of high personal and military character, bright, proficient in the technical and organizational phases of his specialty * *
When consideration is given (1) to the evaluations by Admiral Carney and Near Admiral Wooldridge of the plaintiff’s work during the crucial period from April 20, 1942, to February 27, 1948, (2) to Admiral Brainard’s letter of November 20, 1948, concerning the same subject, and (3) to the nature of the overall record made by the plaintiff during his wartime service, the conclusion is inescapable that Admiral Brainard’s original fitness report for the period from April 20,1942, to February 27, 1943, was an improper and inaccurate evaluation of the plaintiff’s performance of his duties during such period. As previously indicated, it was this fitness report that was responsible, at least principally, for the plaintiff’s non-promotion to the grade of captain.
On the basis of the whole record, it appears that at all times pertinent to this inquiry, including the period from April 20, 1942, to February 27, 1943, the plaintiff demonstrated a better than average competency in the performance of his duties as a commander.
In this connection, the evidence shows that a total of 2,740 Navy commanders were considered for promotion to the grade of captain during World War II, and that only 151 of the 2,740 were never selected for promotion. Thus, it is clear that, with the exception of the plaintiff, all of the wartime commanders of better than average competency were promoted to captain, and even that all wartime commanders of average competency — and doubtless some of less than average competency — were promoted to captain. This unwarranted discrimination against the plaintiff amounted to inequitable treatment of him by the Department of the Navy.
*990 FINDINGS oe Fact
1. This matter has been referred to the Chief Commissioner of the Court of Claims by Senate Resolution 96, 91st Congress, 1st Session, approved September 3, 1969, and providing in pertinent part that:
* * * the bill (S. 881) entitled “A bill for the relief of Commander Edward White Rawlins, United States Navy (retired)” * * * is 'hereby referred to [the] Chief Commissioner of the United States Court of Claims pursuant to sections 1492 and 2509 of title 28, United States Code; and the court shall proceed expeditiously with the same in accordance with the provisions of said sections and shall report to the Senate, at the earliest practicable date, its findings of fact and conclusions thereon as shall be sufficient to inform the Congress (a) of the nature and character of his demand, as a claim legal or equitable, against the United States, (b) whether Commander Rawlins suffered non-promotion to the grade of captain as a probable consequence of any arbitrary, capricious, inadvertent, improper, inequitable, or wrongful act or action or combinations thereof by or within the Department of the Navy, and (c) in such event, the amount legally or equitably due from the United States to the claimant; notwithstanding the lapse of time and any statute of limitations or laches.
2. (a) S. 881, 91st Congress, 1st Session, introduced February 4, 1969, provides in part that “notwithstanding any other provision of law or any commitment in conflict with this Act, Commander Edward White Rawlins * * * shall for all purposes, nunc pro tunc, be deemed to have been promoted to the grade of captain on the active list of the Regular Navy on July 1, 1947, to have served continuously in such grade until June 30, 1955, and on this later date to have been placed on the retired list in such grade,” and that “The United States shall reimburse Edward White Rawlins in full for all expenses, including attorneys’ fees, incurred by him in his efforts to secure the relief which this Act grants to him.”
(b) Senate Report No. 91-376, to accompany Senate Resolution 96, reflects that a “Navy wartime promotion panel *991 declined to promote * * * [plaintiff, a 1924 Naval Academy graduate who bad been promoted to the rank of commander in 1942] to the rank of captain in June 1943', even though many of the members of the class of 1924 were given this promotion,” and that the failure to promote him “to the rank of captain is the subject matter of this legislation.” After reciting plaintiff’s contentions, summarizing the lengthy legislative history of the case, and indicating some of its administrative history, Senate Report No. 91-376 concludes that:
In light of the factual backgi’ound of this claim, the committee agrees with the comments made by the Honorable Joseph D. Tydings when he introduced this legislation:
Mr. President, this case has a long history. It seems to me desirable that Rawlins should be given a “day in court” so that the conflicting factual allegations and conflicting views of the equities of the situation can be sorted out.
Commander Rawlins has submitted evidence contending that he was wrongfully denied promotion to the rank of captain for the Navy during World War II. The Department of the Navy, in its report on this legislation, takes a contrary view. Accordingly, the committee is of the opinion that this [is] a proper case to be referred to the Chief Commissioner of the Court of Claims, so that these factual disputes may be resolved. * * *
3. (a) Plaintiff graduated from the United States Naval Academy June 4,1924, ranking 50th in a class of 525. Effective June 5, 1924, he was appointed ensign, United States Navy. He thereafter served on active duty in the Regular Navy continuously to July 1, 1951, when he was retired in the grade of commander upon his own application, pursuant to the provisions of section 6, Act of February 21, 1946, 60 Stat. 26, 27, as amended, 34 U.S.C. §410b (1952) ,[1] in lieu of mandatory retirement pursuant to the provisions of section 312(c), Officer Personnel Act of 1947, 61 Stat. 795, 859, as amended, 34 U.S.C. §410j(c) (1952).[2]
*992 (b) During bis 'active naval service, plaintiff received promotions[3] as set forth below:

rpg; Date

Lieutenant (j.g.)-June 5, 1927
Lieutenant_June 30, 1932
Lt Commander_ 1938 or 1939
Commander (temporary)_August 20, 1942
4. (a) By letter of March 1, 1939, attorneys for plaintiff’s (then) wife inquired of the Navy Department as to plaintiff’s receipt of “additional compensation on the basis of being a married man”; the said letter, which asserted, inter alia, that plaintiff and his (then) wife had been separated since 1936 and that plaintiff had made no contribution to her support since the separation, was a part of plaintiff’s personnel file at all times here material.
(b) Plaintiff was directed by the Navy to, and on April 18, 1939, did, submit a response to the March 1,1939, letter. His response included (1) a statement in essence denying any improper actions or conduct on his part, and (2) a copy of a 1938 state court decree dismissing his wife’s divorce action and stating that the equities of the divorce action were with plaintiff. By endorsement dated April 18, 1939, plaintiff’s commanding officer noted that “Conversation with Lieutenant Rawlins emphasizes the accuracy of the facts set forth in” plaintiff’s statement.
(e) In April 1949, plaintiff discovered that his April 1939 response was missing from his personnel file. Following a search by the Navy for the response, it was located in Navy archives. On January 12, 1950, a copy of the response was, at plaintiff’s request, filed in his personnel file.
(d) It is reasonable to infer that plaintiff’s response was not filed in his personnel file at any time between 1939 and January 12, 1950.[4]
*993 (e) Plaintiff’s fitness reports and his “correspondence” file were kept by the Navy Department in separate folders.
(f) There is neither proof nor reasonable basis for concluding that the omission had any adverse effect on plaintiff in his several considerations for promotion to the grade of captain.
5. From October 1939 to February 1941, plaintiff, then a lieutenant commander, served as commanding officer of the US'S Tarbell.[5]
6. (a) Prior to June 1942, promotions in the Eegular Navy to the grade of commander and captain were “by selection only from the next lower respective grade upon the recommendation of a board of naval officers as herein provided.” Act of August 29,1916, 39 Stat. 578, as amended, 34 U/S.C.§§ 291-302 (1946).
(b) In or about June 1942, the provisions of statute governing permanent promotion of such Navy officers were suspended. In lieu thereof, Navy promotions were effected for a time under the Act of July 24, 1941, '55 Stat. 603, the so-called “temporary promotion law.”
(c) In effecting temporary promotions to the grade of captain between June 1942 and sometime in 1945, the Navy Department endeavored, within the limitations imposed by the war effort, to adhere generally to the principle of promo-, tion by selection. There was no formal selection board, but a “panel” system. In general terms, the Secretary selected a so-called panel of senior officers of the Navy, some of whom might then be serving overseas, and submitted to each member of the panel a memorandum and a list of names of commanders to be considered for temporary promotion to captain.
(d) Typically, the Secretary’s memorandum asked the panel member to aid him in the task of nominating a stated (approximate) number of commanders for temporary promotion to captain, by indicating those officers whom the member considered “qualified for temporary promotion to the rank of Captain” by “Informal but definite checking on the enclosed list * * Overseas panel members received no records, but were “authorized to confer with senior officers *994 in the area as desired in making your selections.” Other panel members were advised that the Bureau of Naval Personnel would make available to them the records of all officers on the list. While each member of the panel was asked to indicate “those officers on the list whom you consider qualified for temporary promotion,” the Secretary’s advice as to the approximate number of officers to be nominated for promotion necessarily introduced into the individual member’s deliberations an element of comparative evaluation of commanders on the list.[6] After return of all lists to the Secretary, a tabulation of “votes” for each officer was made, and a list of those officers nominated by the Secretary was prepared and submitted to the President for his approval.
7. (a) Plaintiff’s promotion from the grade of lieutenant commander to commander (temporary) in August 1942 was effected pursuant to the panel system described in finding 6 (c), supra. There were at least 17 panel members. Plaintiff, along with some 83 other officers, received 10 “votes”; some 88 officers received more “votes,” one receiving 17; a considerably larger number of officers received nine or fewer “votes.”
(b) In 1942 (and thereafter to sometime in 1945) fitness reports of naval officers reflected, inter alia, numerical ratings on a scale ranging from 0 to 4.0.
(c) According to a knowledgeable Bureau of Naval Personnel official, during the period 1942 to 1943 an officer “would normally be receiving 3.5’s and 3.6’s.” [7] The weight of the evidence is that this testimony described an average, not an outstanding, rating, and that, during the war period, the practice of giving officers practically “perfect” ratings was prevalent. In consequence, as Vice Admiral Gr. H. Fort *995 wrote to plaintiff in 1958, one mediocre report, or even one mediocre mark or remark, stood out “like a sore thumb.”
(d) Plaintiff’s fitness reports during his service in the grade of lieutenant commander reflected ratings ranging from 8.5 to 4.0, with a median rating of nearly 3.8. His last such report as a lieutenant commander covered the period August 9, 1941, to April 20, 1942,[8] and duty as force communication officer with Task Force Twenty-Four,[9] U.S. Atlantic Fleet. Plaintiff was rated 3.9 in his present assignment, 3.8 in his ability to command, and 3.8 in administration; in comparison with all other officers of his rank and length of service, he was rated outstanding; and his commanding officer’s attitude toward having plaintiff under his command was “Particularly desire to have him.”[10]
8. (a) Plaintiff’s first fitness report following his August 1942 promotion to the grade of commander covered the period April 21,1942, to February 27,1943, and duty as force communication officer with Task Force Twenty-Four. The said report, signed by Vice Admiral E. M. Brainard, noted that on January 29, 1943, plaintiff had been commended by the Commander, Greenland Patrol, for initiative and energy for work in connection with the Joint Army-Navy Plan for the Defense of Greenland. On the 0-4.0 scale, plaintiff was rated 3.0 in his present assignment, 2.8 as executive or division officer, and 2.8 in administration. In comparison with other officers of his rank and service, he was rated average, and Admiral Brainard’s attitude toward having plaintiff under his command was “Be satisfied to have him.”[11] Admiral Brainard’s remarks concerning plaintiff were: “An *996 officer of average capability, education and experience. He is conscientious and loyal; a cheerful and genial shipmate.” Markings on force and initiative, two of 13 individual “qualities” rated, were as low-as possible without being unsatisfactory, and markings on several others (including cooperation, judgment and leadership) were only slightly higher.
(b) On August 29, 1947, Admiral Carney, then Deputy Chief of Naval Operations, wrote to Admiral Brainard concerning plaintiff. After stating that plaintiff had been denied “administrative promotion” to the rank of captain by the Secretary of the Navy on the basis that he had been considered but not recommended for such promotion by four panels, Admiral Carney observed that he had seen many Navy captains “who had far less to commend themselves than Ed and who have contributed far less that was constructive to the war effort.” His letter continued, in part, as follows:
I wrote his fitness report up to the day Bris [Admiral Bristol] died and gave him a send-off that was good enough to entitle him to a wartime promotion by a very safe margin. Later, George Murray had him as AirPac Communication Officer, gave him a very good to excellent report, and recommended him for promotion. In the same job, he received a bronze star from Montgomery. He also received a letter of commendation for work in the training command.
The one report in his entire record which was not really creditable was one signed by you covering the period 21 April 1942 to 27 February 1943; that report gave him a 3.0 “in present assignment” and a 2.8 in administration. The remarks were pretty pallid.
Frankly, if I had been on a panel and had seen that report covering such a vital period of our fortunes in the war, I would have given him a complete brush off, and I imagine that that is exactly what happened to him.
* * * * *
* * * [I]f in retrospect you consider that his work was such as not to disqualify him from the percentage of promotions that were common during the war, it might do some good if you wrote a letter to the Secretary of the Navy via the Chief of Naval Personnel. Should you be inclined to do so, and care1 to route it via me for comment, I would feel perfectly justified in saying that I consider Rawlins’ energies, capabilities, and devotion to duty *997 equal or superior to that of many officers who were promoted to the grade of Captain.
(c) Admiral Carney testified at trial of this case, as a witness for plaintiff, that he was detached from Task Force Twenty-Four September 30, 1942, and that he was not contemporaneously familiar with plaintiff’s April 21, 1942, to February 27, 1943, fitness report. It did, however, subsequently come to his attention. In his opinion, plaintiff’s performance of duty to September 30,1942, remained outstanding. He was of the further opinion that the said fitness report was much too low, and that, if seen by panel members, it had an adverse effect on plaintiff’s promotion possiblities.[12]
(d) Captain (later Rear Admiral) E. T. Wooldridge, theretofore operations officer for Task Force Twenty-Four, succeeded Admiral Carney as chief of staff to Admiral Brainard on Admiral Carney’s detachment. What, if any, part Admiral Wooldridge played in preparation of the Brainard fitness report is not established by the record.
(e) In response to Admiral Carney’s request, by letter dated November 20, 1948, to the Secretary of the Navy via the Chief of Naval Personnel, Admiral Brainard stated as follows:
1. It has been brought to my attention by subject officer that his name came before four war-time Selection “Panels”, that he has not been promoted to the rank of Captain along with his contemporaries, and that no Statutory Selection Board has failed to select him for promotion, and, he has requested a letter from me in his behalf.
2. As Staff Communication Officer, Task Force 24, while under my command, I found Commander Rawlins to be of high personal and military character, bright, proficient in the technical and organizational phases of his specialty, genial and of pleasing personality, and, in my opinion, he appears fully deserving of favorable consideration for promotion to Captain, U.S. Navy.
*998 (f) Admiral Carney testified at trial that Admiral Brainard “could have 'been much more eloquent and forceful * * and that he was “disappointed in the letter when I saw it.” When asked if he could reconcile his and Admiral Brainard’s differing views of plaintiff’s service in the same job, Admiral Carney answered thusly [sic]:
There is one thing which might had had and influenced it. Ed Rawlins was never the best shuffler of his routine papers, but as I pointed out to Admiral Brainard that this in no way militated against the performance of his fundamental duties. But that latented administration I felt was probably caused by that * * *.
At trial, plaintiff was not asked to explain, and did not testify concerning, Admiral Brainard’s low rating of him.
(g) At hearings before the subcommittee of the Senate Armed Services Committee on S'. 780, 81st Congress, 1st Session (May 81, 1949), plaintiff was asked if he could explain Admiral Brainard’s low rating of him, and there testified as follows:
I have only this: That occasionally a communication officer gets into hot water with his boss if things begin to go a little bit wrong or if there is a delayed message.
Also I am at times "rather outspoken. I had occasion while the Chief of Staff, Admiral Wooldridge, was the operations officer and Admiral Carney was Chief of Staff, I had occasion to insist upon the type and the completeness of the communication plans that I produced.
Admiral Wooldridge, as the operations officer, took a different point of view and expressed himself quite forcefully to Admiral Carney.
The outcome was that Admiral Carney resolved this contest in my favor. What effect anything of that nature might have, I do not know.
Also at table in staff mess there I did not have any hesitancy about being outspoken in discussions, and perhaps I incurred some degree of annoyance. Those things can have a very direct effect if they occur shortly before a fitness report is made out.
(h) Plaintiff had become aware of the Brainard report, and the two reports described in findings 10(a) and 12(a), infra, by 1946.
*999 9. Plaintiff (and other commanders) received consideration for temporary promotion to the grade of captain, under the system described in finding 6(c), by a panel which commenced work in late August 1943 and completed such work November 6, 1948. The panel was composed of 12 officers (eight rear admirals and four captains), four of whom were serving overseas. Each member was advised that the Secretary of the Navy desired aid in the task of nominating approximately 200 commanders for temporary promotion to the rank of captain, and was asked to “indicate those officers on the enclosed list whom you consider qualified for temporary promotion to the rank of Captain.” The number of names on the “enclosed list” is unclear, but the record suggests that it exceeded 400 commanders. It cannot be said with certainty what the panel vote on plaintiff was, but it is clear that he was not selected for promotion to the rank of captain in 1943 or thereafter.
10. (a) Plaintiff’s fitness report covering the period March 21,1943, to March 31,1944, and duty as force communication officer, Fleet Operational Training Command, U.S. Atlantic Fleet, was signed by Eear Admiral D. B. Beary, commander of said Command. On the 0-4.0 scale, plaintiff was rated 3.7 in present assignment, and 3.5 in ability to command; other elements were not rated. In comparison with other officers of his rank and service, he was rated above average. Admiral Beary’s attitude toward having plaintiff under his command was “Be satisfied to have him.” His remarks concerning plaintiff were: “Commander Eawlins is a quiet, unassuming officer of pleasing personality who has concerned himself with communication duties and performs them in a satisfactory manner.”
(b) In May 1949, plaintiff approached Admiral Dene-brink, Admiral Beary’s chief of staff during the 1943-44 period, respecting the omission from the above fitness report (and the subsequent one described in finding 12) of any recommendation concerning plaintiff’s fitness for promotion to captain. As a result, Admiral Beary, by letter dated May 18,1949, to the Secretary of the Navy, stated as follows:
1. It has just come to my attention that on [fitness reports covering the periods March 21,1943 to March 31, *1000 1944, and April 1, 1944 to June 24, 1944] I made no mention of Commander Rawlins’ fitness for promotion. This was an oversight. I considered him fit for promotion at the time and still do. It is requested that the following sentence be added to my remarks under paragraph 14 of each report :
“Well fitted and strongly recommended for promotion to the rank of Captain.”
(c) It is reasonable to infer that Admiral Beary’s “oversight” had an adverse effect on the plaintiff in his post-1943 considerations for promotion to the grade of captain. The evidence in the record indicates that panels and boards considering naval officers for promotion generally attach importance to the presence or absence of recommendations for promotion from the candidates’ superior officers, and that a strong recommendation for promotion carries more weight with a panel or board than an apparently routine one.
11. Plaintiff (and other commanders) received consideration for temporary promotion to the grade of captain, under the system described in finding 6(c), by a panel which commenced work in early June 1944 and which completed such work August 30, 1944. The panel was composed of nine officers (one vice admiral, three rear admirals, and five captains) ; whether any member of this particular panel was then serving overseas is unclear. Two members had served on the prior, 1943, panel. Each member was advised that the Secretary desired aid in the task of nominating approximately 500 commanders for temporary promotion to the rank of captain, and was asked to “indicate those officers on the enclosed list, not in excess of 500, whom you consider qualified for temporary promotion to the rank of Captain.” The number of names on the “enclosed list” is unclear, nor does the record disclose what the panel vote on plaintiff was.
12. (a) Plaintiff’s fitness report covering the period April 1 to June 24, 1944, and duty as force communication officer, Fleet Operational Training Command, U.S. Atlantic Fleet, was also signed by Admiral Beary. He again rated plaintiff 3.1 in present assignment and 3.5 in ability to command, and above average. His attitude toward having plaintiff under his command improved to “Be pleased to have *1001 Mm.” His remarks concerning plaintiff were: “Commander Rawlins is an officer of wide experience in communications, in which be is most capable. His communications ideas and methods are sound and practical. He has a pleasing personality and cooperates readily.”
(b) On July 9, 1944, plaintiff received (and Admiral Beary noted on Ms fitness report) a letter of commendation for “your outstanding performance of duty as a member of the staff of Commander Fleet Operational Training Command, United States Atlantic Fleet, during tbe period from March 1943 until June 1944.”
13. (a) From June 24 to July 7, 1944, plaintiff was “in transit,” and his file contains this notation, “Report of fitness not required.”
(b) Plaintiff’s fitness report for the period July 7 to August 16, 1944, covering duty as force commumcation officer on the staff of Commander Air Force, Pacific Fleet, was “submitted for record purposes only,” and has no entries thereon reflecting the character of plaintiff’s service during this period.
(c) Plaintiff’s fitness report covering the period August 17,1944 to February 28,1945, and the same duties mentioned in finding 13(b) reflects a change in the form used for rating Navy officers. Some 19 rating factors were listed on the said form. On five such factors, plaintiff was rated within “Top 10%”; on 11 such factors he was rated within “Next Top 20%”; and on three such factors he was rated “Not observed.” The attitude of Ms rater, Vice Admiral G. D. Murray, toward having plaintiff under his command was “Particularly desire Mm”; Admiral Murray indicated that he would promote plaintiff “If 30% [of all officers of the same rank whose professional abilities were personally known to him] were to be promoted.”[13] His remarks concerning plaintiff were as follows:
Commander RAWLINS is an intelligent, forceful and capable officer. He has performed Ms assigned duties as Force Communication Officer in a uniformly excellent manner. He is well informed on all features of naval communications and his knowledge and administrative *1002 ability have contributed to the efficiency of AirPac Communications. He is of pleasing personality and is markedly cooperative. He is recommended for promotion when due.
14. Plaintiff (and other commanders) received consideration for temporary promotion to the grade of captain, under the system described in finding 6 (c), by a panel which commenced work in late January 1945 and which completed such work April 19, 1945. The panel was composed of 17 officers (five admirals and 12 captains); whether any member of this panel was serving overseas is not disclosed by the record. One member (Admiral Louis E. Denfeld) had served on both the prior 1943 and 1944 panels. None of the other members had served on either panel. Each member was advised that the Secretary desired aid in the task of nominating approximately 426 line commanders and 146 naval aviator commanders for temporary promotion to the rank of captain, and was asked to “indicate those officers on the enclosed list, not in excess of the numbers stated above, whom you consider qualified for temporary promotion to the rank of Captain.” The number of names on the “enclosed list” is unclear, nor does the record disclose with certainty what the panel vote on plaintiff was.
15. Plaintiff’s fitness report covering the period March 1 to July 20, 1945, and duty as force communication officer on the staff of Commander Air Force, Pacific Fleet, was signed by Admiral Murray. The report is similar to that rendered on plaintiff by Admiral Murray for the period August 17,1944, to February 28,1945, except that in his second report Admiral Murray indicated that he would “Be pleased to have him,” rather than “Particularly desire him.” Admiral Murray also gave plaintiff two “Within Top 10%,” 13 “Within Next Top 20%,” and four “Not Observed” ratings on the specific rating factors listed in his said second report.
16. Plaintiff (and other commanders, Regular and Reserve) received consideration for temporary promotion to the rank of captain by an “administrative” board which convened at the Navy Department, Washington, D.C., November 1,1945, and adjourned December 5, 1945. The board was composed *1003 of 15 members, eight of whom were Regular Navy officers and seven of whom were Navy Reserve officers. None of the members had served on any of the panels which had considered plaintiff in 1943, 1944, and early 1945. The names and records of those officers of the line of the Navy and Naval Reserve eligible for consideration for temporary promotion to the grade of captain were furnished to the board; it was instructed to recommend for promotion “only those officers who are considered qualified to assume the responsibilities of the higher rank.” The board considered 1160 officers, and selected 865 for promotion. The record does not disclose with certainty what the board vote on plaintiff was, but he was not among those recommended for promotion.[14]
17. (a) Plaintiff’s fitness report covering the period July 21, 1945, to February 28, 1946, and the same duty described in finding 15 was signed by Vice Admiral A. E. Montgomery. There were, again, 19 rating factors listed in the report; Admiral Montgomery rated plaintiff within the “Top 10%” on one factor, within the “Next 20%” on 12 factors, “Within Middle 40 %” on two factors, and “Not Observed” on four factors. Admiral Montgomery indicated that he would promote plaintiff “If 30% [of all officers of the same rank whose professional abilities were personally known to him] were to be promoted,” and that he would “Be pleased to have [plaintiff]” under his command. Admiral Montgomery’s remarks concerning plaintiff were that he “has performed his duties as Force Communication Officer most satisfactorily. He is considered qualified and has been recently recommended for ‘Spot’ promotion to Captain. * * *”[15] A fitness report covering the period March 1 to May 13, 1946, and the same duty, signed by Roar Admiral *1004 C. D. Glover, is almost identical to Admiral Montgomery’s prior one.
(b) In December 1947, plaintiff was awarded the Bronze Star Medal for meritorious achievement as force communication officer on the staff of Commander Air Force, Pacific Fleet, during operations against enemy Japanese forces in the Pacific War Area from July 7, 1944, to September 2, 1945.[16]
18. From about July 24, 1946, to February 3¡, 1947,[17] plaintiff served as commanding officer of the TJSSWichita (then in an inactive status). Two fitness reports covering the said period were signed by Captain Harley F. Cope. On both reports, Captain Cope rated plaintiff within “Top 10 %” on 11 of the 19 rating factors, within “Nest Top 20%” on three factors, and “Not Observed” on five factors. Captain Cope would “Particularly desire him,” and would promote plaintiff if only 10 percent of all officers of plaintiff’s rank and service known to Captain Cope were to be promoted. Plaintiff was “highly recommended for promotion when due” on one report, and “strongly recommended for promotion” on the other.
19. From about February 8 to June 27, 1947, plaintiff served as Deputy Commander (and for a time Acting Commander) SubGroup One, Philadelphia Group, Atlantic Reserve Fleet. Two fitness reports covering the said period were signed by Captain Cope. On these reports, Captain Cope gave plaintiff a rating of within “Top 10% ” on 13 of the 19 rating-factors, within “Next Top 20%” on 'one factor, and “Not Observed” on five factors. His attitude toward having plaintiff -under his command, and his opinion of plaintiff’s promotion potential, remained unchanged.
20. (a) On June 9, 1947, plaintiff addressed a five-page, single-spaced, letter to the Secretary of the Navy, “Subject: Promotion to the rank of Captain, USN.” The letter stated that, after 23 years’ “unbroken” and “unmarred” commis *1005 sioned service, “marked by numerous excellent fitness reports, one mediocre, and many very good to excellent,” “reasons of equity and justice as supported by the facts set forth above [merited the taking of action] to restore me to the lineal position corresponding to my present permanent rank and the present permanent rank of my TJSNA class * *
(b) On June 10, 1947, Captain Cope endorsed plaintiff’s letter of June 9,1947, stating in part that plaintiff was then occupying a “billet” which “calls for an officer of Captain’s rank,” and that he “strongly recommends that this case be reviewed and favorable action taken.”
(c) By second endorsement dated July 7,1947, the Chief of Naval Personnel forwarded plaintiff’s letter of June 9, 1947, to the Secretary, recommending disapproval and commenting that plaintiff’s “name and complete official record were submitted to four separate and duly constituted selection boards during the period between November 1943 and December 1945 and that none of the approved reports of these boards included his name among those selected.” He added that “There is no evidence of unfairness or partiality in the history of his case.” [18]
(d) By letter dated July 16, 1947, the Secretary of the Navy advised plaintiff in part that:
1. * * * ,[T]he records of the Navy Department have 'been carefully scrutinized to insure that promotional action in your case has been fair and impartial.
2. * * * [Y]our name and complete official record were submitted to four separate and duly constituted selection boards during the period between November 1943 and December 1945. * * * [N]one of the approved reports of these boards included your name.
3. The confidential nature of the proceedings of selection boards precludes determining the reason or reasons for the selection or non-selection of any eligible eandi- *1006 date, since in the interest of fairness to all concerned these boards are required to indication a list only those officers whom they consider best qualified for promotion. However, the complete record of each candidate is reviewed by each member of the board and it must 'be accepted that officers recommended for promotion were those whom the boards adjudged the best qualified from among the eligible candidates whose names were submitted for consideration.
4. Your non-selection should not be regarded as an indication that your service has been unsatisfactory; to the contrary the Department appreciates your contribution to the successful conclusion of the recent conflict, in recognition of which you have been awarded the Bronze Star Medal and a Letter of Commendation.
5. In view of the above and in the absence of evidence that any injustice has occurred in your case, your advancement to the rank of Captain is not approved.
(e) The reference, in findings 20(c) and (d), to submission of plaintiff’s complete official record to “selection boards” is misleading insofar as it neglects to recognize that at least some members of the 1943 panel were overseas, and that overseas panel members did not receive or review records ; and, of course, three of the “selection boards” were not formal selection boards, but panels.
21. From about July 1, 1947, to June 30, 1948, plaintiff served as Secretary to the Joint Intelligence Committee (JCS) of the Joint Intelligence Group (Joint Staff). Three fitness reports covering the said period were signed by Captain W. G. Lalor. The first of these reports, covering approximately 2 months, reflects that plaintiff had been in “present assignment” for such a short period as to preclude any firm opinion of his fitness. On the second and third reports, Captain Lalor rated plaintiff within “Top 10 %” on four, and three, of the 19 rating factors, respectively; within “Next Top 20%” on eight, and nine, of the said factors, respectively; within “Middle 40%” on two factors; and “Not Observed” on five factors. His attitude toward having plaintiff under his command was “Be pleased to have him,” and he would promote plaintiff if 30 percent of all officers of plaintiff’s rank and service known to him personally were to be promoted. On one report, Captain Lalor stated that plain *1007 tiff was “Qualified for promotion to next higher grade,” and' on the other that he was “Qualified for promotion and so recommended.”
22. Following August 7, 19,47, promotions in the Regular Navy to the grade of captain were made under the provisions of the Officer Personnel Act of 1947, 61 Stat. 795. That Act reinstituted, insofar as the Navy was concerned, a system of consideration for selection for promotion by a statutory selection board; in general terms, it also provided for elimination from the active list of the Navy for two failures of selection.
23. (a) On August 29, 1947, Admiral Carney addressed to Admiral Brainard the letter described in finding 8 (b). Se.e finding 8(e) for Admiral Brainard’s response.
(b) On September 2, 1947, plaintiff requested that the Secretary of the Navy authorize him to communicate “.with one or more members of Congress on the subject of my recent request for promotion to the rank of Captain, U.S. Navy * * *.”
(c) On September 15,1947, the Secretary advised plaintiff that he “desires to interpose no objection to your communicating with members of Congress,” but that any such communication should be forwarded via the Navy Department.
( d) On September 16,1947, the Secretary wrote to Senator Millard F. Tydings in part as follows:
I find that the Commander has a good record of service to the Navy. He was promoted to his present rank in 1942, and has been brought before four selection boards for promotion to the rank of Captain. These boards, as you know, are reconstituted each time they meet for the purpose of selecting officers for advancement. The composition of one board which considered the case of Commander Rawlins, therefore, was not duplicated the next time his record was submitted for selection. This insures objectivity in the consideration of each case, and precludes the possibility of prejudice resulting from past discussions or decisions.
In selecting officers for promotion, each Statutory Selection Board weighs all the information in the record of each officer being considered, and compares each officer’s record against that of the others eligible for promotion. The normal result of this system is the selection of only the most outstanding officers for promotion and *1008 the rejection of all the others. Unfortunately, this means that many excellent officers must be left behind simply because there is not room at the top for everyone. However, in order further to insure fairness, and to meet the changing needs of the service, an officer is given the opportunity of having his record reviewed by more than one selection board.[19]
I feel that the selection system is equitable, and though I appreciate fully your regret over Commander Rawlins’ failure to be promoted, I am sure you understand and approve the Navy’s position.
24. (a) On December 16, 1947', (then) Vice Admiral Carney recommended to the Secretary of the Navy that plaintiff be awarded the Bronze Star Medal “in recognition of his exceptionally meritorious conduct in the performance of outstanding services” with Task Force Twenty-Four from March 1941 to April 1942.
(b) On December 29, 1947, Admiral Denfeld, Chief of Naval Operations, forwarded Admiral Carney’s recommendation with the notation that he recommended approval of the award of the Bronze 'Star Medal to plaintiff.
(c) On January 13,1948, the Navy Department Board of Decorations and Medals recommended to the Secretary that ■the proposed award be disapproved.
(d) On March 9, 1948, Admiral Denfeld returned the matter to the said Board for reconsideration, stating that “I feel that the services rendered during the first five months of the war were so outstanding and successful that the award of the Bronze Star Medal is deserved and merited, and I so recommend.”
(e) On March 22, 1948, the said Board advised the Secretary that it “has reconsidered its recommendation as requested in the previous endorsement and after careful study recommends that [plaintiff] be awarded a Letter of Commendation * * * for his services as Communication Officer * * * from December 7,1941, to April 20,1942.”
(f) The Secretary approved the foregoing recommendation March 25, 1948.
*1009 25. (a) On December 16, 1947, the Board for Correction of Naval Records (“BCNR”), created pursuant to Section 207, Legislative Reorganization Act of 1946, 60 Stat. 812, 837, as amended, 10 U.S.C. § 1562 (1964), held a review of an application by Commander Edward K. Shanahan, United States Navy, for “correction of unjust loss of precedence.”
(ib) On March 31,1949, the BCNR expressed the conclusion that Commander Shanahan had suffered an injustice in that a 1942 failure of selection should have been considered a case of non-consideration, rather than failure of selection, and that Commander Shanahan had thereby been improperly precluded from subsequent (1947) consideration by an administrative board authorized to take action to readjust the precedence of officers whose records reflected a single failure of selection during wartime.
(c) On April 13,1949, the Secretary of the Navy approved the foregoing conclusion of the BCNR, but stated that its decision (in effect, that a special selection board should be convened to consider Commander Shanahan’s case and to make an advisory report to the Secretary thereon) had been substantially fulfilled by consideration given Commander Shanahan by a selection board convened in late December 1948 to select commanders for temporary promotion to the grade of captain; the Secretary added that, the 1948 selection board having failed to select him, despite informal advice of “the indication of injustice in this case,” no further action on the case was contemplated.
(d) On June 14, 1949, the BCNR advised the Secretary that its prior decision was withdrawn, and that it had substituted therefor the decision that the Secretary should “completely rectify the established injustice, by effecting the promotion of Commander Shanahan to the rank of Captain, U.S. Navy, with appropriate adjustment of lineal position.” The BCNR “contemplated” that this be done, on the Secretary’s recommendation, by Presidential appointment or, as an alternative, “by Act of Congress * *
(e) On October 26, 1949, the Secretary disapproved the BCNR’s new decision concerning Commander Shanahan. The Secretary also stated that “Since there is presently pro *1010 posed general legislation in Congress which would afford Commander Shanahan an opportunity for hearing and presumably effective remedy of the inequity claimed, it is not appropriate at this time to present private legislation for his benefit.”
28. From about July 15, 1948, to August 14, 1950, plaintiff served with the TJ.S. Naval Administrative Command, Central Intelligence Agency. Six fitness reports covered the said period; five were signed by Captain C. L. Winecoff, while one, covering the period April 13 to August 14, 1950, was signed by Captain W. C. Gilbert. Both Captain Winecoff and Captain Gilbert rated plaintiff as within “Top 10 %” on a great majority of the rating factors actually rated on the said reports, and within “Next Top 20 %” on those not so rated (some rating factors on each report were “Not Observed”) ; both would promote plaintiff “If only 10% [of all officers of his rank and service personally known to them] were to be promoted.” On all five reports he signed, Captain Winecoff would “Particularly desire him”; Captain Gilbert indicated that he would “Be pleased to have him.” Captain Winecoff’s reports reflect that he recommended plaintiff for promotion (on three occasions “strongly”). Captain Gilbert indicated that plaintiff was “qualified for promotion when due.”
27. (a) By letter dated December 20, 1948, Senator Millard F. Tydings asked the Secretary of the Navy whether plaintiff’s case might be reviewed by the BCNR.
(b) By letter dated January 14, 1949, the Secretary in substance advised Senator Tydings that there were a “certain few established procedures which, by their peculiar nature, do not lend themselves readily to administrative or judicial review within the Department and must, at some point, obtain a measure of finality,” and that findings of “duly constituted selection boards or panels would seem to fall within such category.”
(c) There is no evidence as to whether plaintiff ever made an application to the B'CNR for correction of his naval record.
*1011 28. (a) S. 780, 81st Cong., 1st Sess., a bill for plaintiff’s relief introduced in early 1949 by Senator Tydings, in substance authorized the President to promote plaintiff to the permanent rank of captain, “to rank from June 1,1943, with precedence * * *” specified in S. 780, and to pay him the difference between the amounts he had in fact been paid, and those he would have received had his promotion “been made effective for pay purposes on December 1,1943.”
(b) A hearing was held on S. 780 before a subcommittee of the Senate Armed Services Committee on May 31,1949. Plaintiff, and others, appeared and testified before the subcommittee (see finding 7, n. 7).
(c) Admiral Roper, then Assistant Chief of Naval Personnel, appeared on behalf of the Navy Department in opposition to S. 780. He testified, in response to a question from a subcommittee staff assistant, that the BCNR had “never, to my knowledge, considered a promotion case as being within its purview.” He went on to say that “We have always contended that no record of long standing can be changed by a request to have it changed at a later date.”[20]
(d) The Senate Armed Services Committee favorably reported S. 780, amended to provide in substance that the Secretary of the Navy should appoint a board to review the records of all officers of the Regular Navy and Marine Corps who had failed of advancement between June 1942 and August 1947, for error, administrative delay, oversight, or injustice substantially prejudicial to the officer concerned. S. 780, as thus amended, passed the Senate July 6,1949.
(e) Hearings on S. 780, as amended, were held before Subcommittee No. 1, House Armed Services Committee, in 1950. Plaintiff, and others, appeared and testified before the said subcommittee.
(f) Admiral Roper, by 1950 Chief of Naval Personnel, again appeared on behalf of the Navy Department in opposition to enactment of S. 780, as amended, on the ground that its enactment would “tend to vitiate the results of the orderly system of promotion by selection * *
*1012 (g) 'S. 780, as further amended, was favorably reported by the House Armed Services Committee, but failed of passage in the House of Representatives.
29. (a) In January 1950, plaintiff was considered for promotion to the grade of captain by a statutory selection board (see finding 22) but was not selected by the board for such promotion.
(:b) In October 1950, plaintiff was again considered for promotion to the grade of captain by a statutory selection board, but was not selected by the board for such promotion.
(c) While the reasons for plaintiff’s failures of selection in 1950 were not made a matter of record, it is reasonable to conclude that plaintiff was then handicapped by being in competition with officers, on the average, several years younger than he then was, with brilliant wartime records.[21] The October 1950 board was advised by a representative of the Bureau of Naval Personnel that plaintiff was then seeking legislative relief. It is reasonable to infer from the evidence that the latter factor had an adverse effect on the board’s deliberations as regards the plaintiff.
30. (a) From about September 2, 1950, to May 18, 1951, plaintiff served in the Philippines as representative of the Military Sea Transport Service, and, from March 23 to May 19,1951, as “NCSO, Manila.” Two fitness reports covering this period were signed by Captain A. F. Junker; both were “satisfactory.”
(b) Plaintiff was retired in the grade of commander effective July 1, 1951. See finding 3 (a), supra.
31. (a) In January 1955, S. 108, 84th Cong., 1st Sess., a bill for the relief of Commander Shanahan and plaintiff, was introduced in the Senate. Hearings on S. 108 were held before a subcommittee of the Senate Armed Services Committee April 29, 1955. Plaintiff testified personally at the said hearings, and submitted a considerable amount of documentary evidence. The then Assistant Secretary of the Navy *1013 for Personnel and Reserve Forces testified in opposition to enactment of 6. 108.[22]
(b) The report of the subcommittee of the Senate Armed Services Committee on S. 108 (adopted by the Committee July 28, 195'5) reflects in part that:

Findings

After careful screening ouit of the very considerable amount of irrelevant matter presented, and carefully evaluating the established facts, the Subcommittee finds with respect to Commander Rawlins that (1) his failure of selection was the result of the free exercise of the best judgment of the members of properly designated selection panels and boards; (2) the test of Rawlins’ fitness for promotion which was applied simultaneously to his contemporaries must be regarded as the proper test, unless some irregularity can be shown to have influenced the panels or boards; (3) no such irregularity has been established * * *.

Conclusions and Recommendations

Failure to receive a promotion is understandably a grave disappointment to the individual, whether he be in the military service or in civilian life. Insofar as it involves failure of selection under an established system it becomes an injustice only if some irregularity can be shown to have influenced the persons charged with making the selection. The Subcommittee concludes that with respect to Commander Rawlins, available evidence fails to establish an entitlement to promotion, either retroactively or prospectively, and recommends no further consideration of his claim. * * *
32. (a) In a letter dated April 21, 19.60, to the Secretary of the Navy respecting plaintiff’s case, the Honorable Carl Vinson, Chairman, House Committee on Armed Services, stated in part that:
Legislation does not seem to be the appropriate method for handling this matter, but I do think that the case should be considered carefully by the Board for the Cor *1014 rection of Naval Records and a decision should be made once and for all.
I trust you will agree with me that the proper procedure at this time is to award jurisdiction to the Board for the Correction of Naval Records in order that that board may consider this case in toto. * * * If this board approaches the matter impartially, as I am sure it will, and with a view toward doing that which is correct and just, then I am sure the case can be settled once and for all.
(b) In a reply, dated June 24, 1960, from the Secretary of the Navy to Congressman Vinson, of which plaintiff was subsequently apprised, the Secretary stated in part that:
In considering the question as to whether or not Commander Rawlins [sic] case should be referred to the Board for the Correction of Naval Records, I have arrived at the conclusion that the Board is not a proper forum for a case of this nature. * * *
* * * * *
After a thorough consideration of all facets of this case, I find no injustice. * * *
* * * I have made my own independent evaluation of the entire case, including the new brief submitted by Commander Rawlins. * * *
$c $ # * *
I am of the opinion that no useful purpose can be served by referring to the Board for the Correction of Naval Records, a board advisory in nature to me, a case in which I have personally reviewed the records, and finally after considerable deliberation, reached the conclusion that Commander Rawlins has suffered no injustice incident to his promotional failure under the wartime panel system.
33. (a) In 1961, two resolutions for plaintiff’s relief were introduced in the House of Representatives. A hearing on those resolutions, before a subcommittee of the House Armed Services Committee, was scheduled for August 2,1961. Plaintiff reasonably expected that the subcommittee would recommend to the Secretary of the Navy that plaintiff’s case be considered by the BCNR.
(b) On August 2,1961, prior to the scheduled hearing, the Under Secretary of the Navy advised plaintiff that he was *1015 willing bo appoint a “special advisory board” of Naval officers bo consider plaintiff’s record as it was during World War II (corrected to include plaintiff’s April 18, 1939, response (see finding 4, supra)) and to recommend to the Under Secretary whether plaintiff should have been “among those officers recommended for promotion to the grade of captain” by the three panels, and one administrative board, which had considered him for temporary promotion during the 1943-45 period. Hie Under Secretary indicated to plaintiff his unwillingness to agree to consideration of plaintiff’s case by the BCNR; stated that plaintiff would have no right to appear, or to call witnesses to testify in his behalf, before the special advisory board; stated that no “new evidence” plaintiff had assembled since 1945 would be considered; and advised plaintiff that a request for, and agreement to abide by the decision of, such a special advisory board was a prerequisite to the convening of the board.
(c) Plaintiff, aware of the Navy’s view that the BCNR was “advisory in nature” to the Secretary, and of the view that should he succeed in having his case heard by the BCNR, its recommendation would be subject to review by a possibly antagonized Secretary, agreed to the Under 'Secretary’s proposal because he felt that he had no other reasonable alternative.
(d) By letter dated August 11, 1961, plaintiff formally requested that a special advisory board be convened to consider “my selection for promotion to captain during the period 1943 to 1945.” Plaintiff stated that he had examined the precept prepared for the proposed board and was satisfied with it, and that he would “abide by the decision reached pursuant to this board’s deliberations.” Plaintiff did request that Admiral Beary’s letter of May 18,1949 (finding 10(b), supra), and a copy of the instructions issued to the first wartime panel (see finding 9, supra) be brought to the attention of the special advisory board. He did not, however, include Admiral Brainard’s 1948 letter in'his request.
(e) By letter dated August 15,1961, the Navy Department advised plaintiff that his said request had been denied.
(f) By letter dated September 19, 1961, plaintiff was ad *1016 vised by the Under Secretary that the special advisory board had examined the record and considered the case of every officer whose name was furnished the board by the Chief of Naval Personnel with respect to the 1943,1944, and 1945 panels and the 1945 administrative board, and had concluded that plaintiff’s promotion by any of these bodies “was not appropriate.” The Under Secretary further stated that he had approved the special advisory board’s proceedings and recommendations September 13,1961, and that “the question of your promotion has been resolved against you and it is considered that the matter is closed.”
34. Throughout his entire period of service as a commander, up until his final consideration in October 1950 by a statutory selection board for promotion to the grade of captain, the plaintiff demonstrated that he was an officer of better than average competency in the performance of his duties.
35. (a) A total of 2,740 Navy commanders were considered for promotion to the grade of captain during World War II; and only 151 of the 2,740 were never selected for promotion.
(b) With the exception of the plaintiff, all of the wartime commanders of better than average competency were promoted to the grade of captain; and all wartime commanders of average competency were also promoted to the grade of captain.
Conclusion
As previously indicated in part II-C of the opinion, an improper and inaccurate evaluation of the plaintiff’s performance of his duties during the period from April 20,1942, to February 27, 1943, was responsible, at least principally, for the plaintiff’s non-promotion to the grade of captain; and the Navy’s failure to promote the plaintiff, a commander of better than average competency, to the grade of captain, when all the other commanders of better than average competency with whom he was in competition, and even all the commanders of average competency with whom he was in competition, were promoted to captain, was unwarranted discrimination against the plaintiff that amounted to inequitable treatment of him by the Department of the Navy.
*1017 Thus, there is equitably due the plaintiff from the United States a retroactive promotion to the grade of captain. However, the evidence in the record is not sufficient to permit a precise determination to be made as to the exact time when the Navy’s inequitable treatment of the plaintiff actually became effective. For example, there is no basis upon which a determination can be made as to whether the failure of the wartime panel of Augush-November 1943 to include the plaintiff among the 200 (approximately) commanders who were selected at that time for promotion to the grade of captain amounted to inequitable treatment of the plaintiff, since there is no way of knowing how the plaintiff’s qualifications for promotion compared with the qualifications of the 200 commanders who were actually selected. The same thing is true with respect to the action of the June-August 1944 panel that selected 500 (approximately) commanders for promotion to the grade of captain.
On the other hand, it certainly seems to be clear that by July 1,1947 — the date mentioned in S. 881 for a retroactive promotion to be effective — the inequitable treatment of the plaintiff by the Department of the Navy had taken effect. By that time, 200 commanders with whom the plaintiff was in competition had been selected by the August-November 1943 panel for promotion to the grade of captain, 500 had been selected by the June-August 1944 panel, 572 had been selected 'by the January-April 1945 panel, and 865 had been selected by the November-December 1945 administrative board.
Accordingly, the Review Panel informs the Senate (1) that Commander Edward White Rawlins, the plaintiff, has an equitable — but not a legal — claim against the United States, the defendant, (2) that the plaintiff suffered non-promotion to the grade of captain as a probable consequence of improper and inequitable actions within the Department of the Navy, and (3) that there is equitably due the plaintiff a retroactive promotion to the grade of captain on the active list of the Regular Navy as of July 1, 1947, and retroactive retirement in that grade as of July 1, 1951 (the date of the plaintiff’s actual retirement).
*1018 The petition which the plaintiff filed in the proceedings before the Chief Commissioner of the Court of Claims asked for findings to the effect that the plaintiff was equitably entitled to receive from the defendant (1) the difference in salary and retirement pay between the amount which the plaintiff has actually received and the amount which he would have received if he had been promoted to the grade of captain at an appropriate time, and (2) reimbursement for all expenses, including reasonable attorneys’ fees, incurred by the plaintiff in his efforts to secure promotion to the grade of captain. However, the plaintiff did not present in these proceedings any evidence upon the basis of which findings could be made concerning financial payments equitably due the plaintiff from the defendant.
With respect to the matter mentioned in the preceding paragraph, the record indicates that the parties have agreed to stipulate the monetary amounts equitably due the plaintiff from the defendant, in the event of a decision favorable to the plaintiff on the main issue in the present proceedings.

 It was eventually located In Navy archives, where It had probably come to rest at the end of the litigation. On January 12, 1950, a copy of the response was placed in his file.

 In 1948, in consequence of Admiral Carney’s (and Admiral Louis E. Den-feld’s) recommendations that plaintiff be awarded the Bronze Star Medal for his service with Task Force Twenty-Four to April 20, 1942, plaintiff was awarded a Letter of Commendation for his service from December 7, 1941, to April 20, 1942. Finding 24. Plaintiff was a lieutenant commander throughout that period.

 By 1943, a fifth choice (excellent), between outstanding and above average, had been added.

 On November 20, 1948, Admiral Brainard, at Admiral Carney’s instigation, wrote to tbe Secretary of the Navy concerning plaintiff. Finding 8(e). Admiral Brainard’s letter is set out and discussed in part II C, infra.

 On July 9, 1944, plaintiff was commended by the Commander, U.S. Atlantic Fleet, for his “outstanding performance of duty” from March 1943 to June 1944.

 Plaintiff’s August 1942 promotion to commander (temporary) was affected under the “panel” system.

 The record does suggest that the 1943 panel considered in excess of 400. Also, the record shows that an overall total of 2,740 commanders were considered for promotion to the grade of captain during World War II, and that only 151 of the 2,740 were never promoted.

 Plaintiff's 1948 commendation for 1941-42 service also came long after the panels.

 The board considered some 582 line commanders of the Regular Navy, and recommended 439 for promotion. The record suggests that plaintiff received four of 15 votes, and that he stood about 500th among those regular line commanders considered.

 In 1946, plaintiff was awarded the Bronze Star Medal, with temporary-citation, for his service from July 7, 1944, to September 2, 1945. This service antedated the administrative board, but both the award and a February 28, 1946, recommendation for a “spot” promotion to captain obviously did not.

 By 1947, plaintiff was aware of the Brainard and Beary 1942-44 fitness reports, but was not aware that his 1939 response was not in his file.

 This, of course, was not entirely accurate. Some members of the 1943 panel were overseas. The 1944 and 1945 panels may also have had overseas members. Overseas panel members received no records.

 Section 207 provided, and provides, in substance that the Secretary of a military department, acting “through” a board of civilians of the executive part of that department, may correct any military record of that department ■when “necessary to correct an error or remove an injustice.”

 OJ. Section 131, Legislative Reorganization Act of 1946, supra: “No private bill or resolution * * * authorizing or directing * * * the correction of a military or naval record, shall be received or considered in either the Senate or the House of Representatives.”

 Plaintiff assigns, inter alia, (1) that his 1939 response was missing from his file to January 1959; (2) “inadvertent” omissions, from Admiral Brainard’s and Admiral Beary’s 1912-44 fitness reports, of any recommendation concerning plaintiff’s fitness for promotion; (3) Navy Department statements and positions in 1947 and thereafter which misled by allusion to statutory selection board procedures when the Navy knew or should have known that the wartime bodies which declined to recommend plaintiff for promotion were not statutory boards; and (4) the Navy’s attitude (not always consistent) respecting consideration of selection (or, more accurately, non-selection) cases by the Board for the Correction of Naval Records.

 See Bennett, Private Claims Acts and Congressional References, 9 ATP JAG L. Rev. (No. 6) 9,11-12 (1967).

 Cf. Hertzog v. United States, 167 Ct. Cl. 377 (1964), and eases there cited.

 Even Admiral Beary's 1949 statement of 1943 — 44 oversight was excluded.

 Parenthetically, the Senate was well aware of the 1961 agreement when It referred the bill for plaintiff’s relief to the Chief Commissioner for a report.

 Compare findings 25, 27, 31(a), n. 22, and 32. And see Harris, Some Principles Governing the Board for Correction of Naval Records and the Federal Statute Creating It. A Legalistic Approach, 42 Geo. L.J. 210, 223 (1954) : “As the original rules [of the BCNR] excluded cases involving decisions of Selection Boards, * * * this deliberate broadening of jurisdiction [by regulations effective October 1, 1952] indicates that the classes of cases formerly excluded are now Included * * See also Williams, The Army Board for Correction of Military Records, 6 Mil. L. Rev. 41 (1959) ; Redd, The Board for Cotrection of Naval Records, 19 Navy JAG Journal 9 (1964) ; 32 CPR 723 (1971),

 Generally, “equitable” relief, within the meaning of Section 2509, “must rest on some unjustified act or omission to act which caused plaintiff's damage. But for that, any award would be a gratuity.” Clarkson v. United States, 194 Ct. Cl. 963, 972 (1971).

 Binding 8(b) ; see also findings 7(c), 8(c), 20(a). In the selection process, a mediocre report, or even a mediocre mark or remark, stood out “like a sore thumb.”

 Now codified as 10 U.S.C. § 6323 (1964).

 Now codified as 10 U.S.C. § 6379 (1964).

 Plaintiff accepted appointment as a lieutenant commander May 22, 1939, with an earlier and presently unclear date of rank. Of. finding 4. His date of rank as a commander was July 17, 1942. He accepted permanent appointment as a commander September 27, 1947, wit'll date of rank July 17, 1942.

 See Rawlins v. United States, 93 Ct. Cl. 231 (1941). The court there found that in 1989 the Chief, Bureau of Navigation, “forwarded all the papers” to the Chief, Bureau of Supplies and Accounts, who in turn referred “the papers” to the Secretary of the Navy, and that the Secretary then referred the matter to the Comptroller General. Checkage because of an alleged overpayment of dependency allowances, and the cited litigation (in which plaintiff was successful) followed. The most likely explanation is that, following the litigation, plaintiff’s response came to rest in Navy archives rather than in his personnel file.

 See findings 18,19, for other command duty.

 Between 1943 and April 1945, three panels considered plaintiff along with other commanders for temporary promotion to captain. The members of the second and third panels were specifically instructed that their indications should not be “in excess of” the approximate numbers stated in the memoranda.

 The quotation is from the testimony of Captain W. G. Michelet, then head of the Records Section, Bureau of Naval Personnel, at hearings before a subcommittee of the Senate Armed Services Committee on S. 780, 81st Congress, 1st Session (May 31, 1949). By stipulation, the testimony of Captain Michelet, and that of three other witnesses before the said subcommittee (Roar Admirals P. C. Denebrinlr, J. W. Roper, and E. E. Stone) is to be considered as though given at trial.

 In 1948, plaintiff received a letter of commendation for his service In Task Force Twenty-Four from December 7, 1941, to April 20,1942. See finding 24.

 The Task Force Commander exercised “coordinating supervision over eseort-of-convoy in the Western North Atlantic including U.S., British and Canadian Forces.” Vice Admiral A. L. Bristol, who should have signed this report, died suddenly April 20, 1942, prior to signing it. The report was in fact prepared by Admiral (then Captain) Robert B. Carney, then chief of staff, Task Force Twenty-Four, U.S. Atlantic Fleet.

 Other comparative ratings available included above average, average, and below average; listed “attitude [s]” included “Be pleased to have him,” “Be satisfied to have him,” and “Prefer not to have him.”

 For the attitudes available, see finding 7(d), n. (10. This report, however, had available five comparative ratings: outstanding, excellent, above average, average, and below average.

 Captain Michelet testifies in 1949 that the said report “compares rather poorly with that of good officers.” Admiral Roper, then Deputy and Assistant Chief of Naval Personnel, testified at the same hearing that the said report “would have considerable effect,” at least on the 1943 panel.

 Percentage choices available included 90, 70, 30, and “only 10.”

 Some 582 regular commanders of tile line were considered, and 439 selected. The record suggests that plaintiff received four of 15 votes, ranking about 500th among those regular line commanders considered.

 Admiral Montgomery recommended plaintiff for “spot” promotion to the rank of captain February 28, 1946, advising the Chief of Naval Personnel that he had known plaintiff for many years, had observed him personally since July 20, 1945, and was of the opinion that “his performance of duty in his present assignment and the importance of that assignment * * * warrant his spot promotion * * * at this time.” Admiral Montgomery did not know, he said, why plaintiff’s promotion had “been held up.”

 The record suggests that this was the consequence of Admiral Montgomery’s presentation of the Bronze Star Medal, with “temporary citation,” to plaintiff on May 13,1946.

 Plaintiff was in a non-duty status, and not rated, from May 14 to about July 23,1946.

 On June 11,1947, Admiral Wooldridge addressed a memorandum to Admiral Roper, Bureau of Naval Personnel (finding 8(d)), in which he forwarded a copy of plaintiff’s letter of June 9, 1947, to the Secretary and commented that:
I have observed Rawlins’ wort and consider him ultra-conscientious, bright and energetic, and of an extremely high military and personal character. I have no idea as to why he was not selected. However, have seen quite a large number of Captains who were promoted who were not in my opinion the equal of Commander Rawlins in military attainment and personal characteristics.
I would, of course, appreciate it if you would give his request the highest consideration.

 The Secretary’s allusion to “Statutory Selection Board” procedures was at least inapposite. The four “selection hoards” mentioned in the first quoted paragraph of his letter were not statutory selection boards.

 Cf. findings 25, 31 (a), n. 22.

 Too, the circumstance that plaintiff had not been promoted during World War II cannot have helped him.

 The Assistant Secretary also testified that “If there has been an obvious miscarriage of justice [in the selection process], the individual affected can submit his case to the Board for Correction of Naval Records, and the Navy Department often supports people in their petitions.” Plaintiff then stated that he had been “denied a hearing before that very board.” See finding 27.