**Edward White RAWLINS**

v.

**The UNITED STATES.**

**No. 456–79C.**

United States Court of Claims.

Aug. 11, 1982.

McGrath, Washington, D. C., for defendant; Captain Geoffrey P. Lyon, Dept. of the Navy, Washington, D. C., of counsel.

Before COWEN, Senior Judge, and DAVIS and NICHOLS, Judges.

COWEN, Senior Judge:

Plaintiff is a former commander in the United States Navy who voluntarily retired in 1951 after 27 years of service. He instituted suit in this court pursuant to Private Law 95–60, 92 Stat. 3817 (1978), "An Act conferring jurisdiction upon the United States Court of Claims to hear, determine and render judgment upon the claim of Commander Edward White Rawlins, United States Navy (retired)." Plaintiff contends that defendant's failure to promote him to the rank of captain was improper, inequitable, arbitrary, capricious, an abuse of discretion, and in violation of the United States Constitution, federal statute and Navy regulations.

In his motion for summary judgment, plaintiff requests an award of damages of $109,084.59 as a result of his allegedly wrongful nonpromotion by the Navy, an order directing the Navy to pay him the current net pay of a retired captain with 31 years active service, and corresponding survivors benefits for his survivors and beneficiaries, plus prejudgment interest, attorney's fees and costs. Defendant has filed a cross-motion for summary judgment seeking dismissal of plaintiff's petition. After hearing oral argument and reviewing the record, we grant plaintiff's motion in part and remand the case to the trial division to determine the amount of plaintiff's recovery and for further proceedings on the claim for attorney's fees under the Equal Access to Justice Act.

Alan S. Weitz, Washington, D. C., attorney of record, for plaintiff; Ginsburg, Feldman, Weil & Bress, Washington, D. C., of counsel.

Virginia I. Bell, Washington, D. C., with whom was Asst. Atty. Gen. J. Paul

I.

Edward White Rawlins was appointed to the United States Naval Academy in 1920 and graduated 50th in his class of 525. In 1924 he was appointed an ensign in the Regular Navy. Plaintiff served continuous-

ly in the Navy until 1951, having achieved his last promotion to the rank of commander in July 1942.

Following his retirement from the Navy in 1951, Rawlins diligently pursued his efforts to obtain a retroactive promotion to the rank of captain. Between 1953 and 1978, 22 different legislative proposals were introduced in Congress in his behalf.

S. 881, 91st Cong., 1st Sess., was introduced on February 4, 1969, and provides in part:

[N]otwithstanding any other provision of law or any commitment in conflict with this Act, Commander Edward White Rawlins * * * shall for all purposes, nunc pro tunc, be deemed to have been promoted to the grade of captain on the active list of the Regular Navy on July 1, 1947, to have served continuously in such grade until June 30, 1955, and on this later date to have been placed on the retired list in such grade * * *.

The United States shall reimburse Edward White Rawlins in full for all expenses, including attorneys' fees, incurred by him in his efforts to secure the relief which this Act grants to him.

In 1969, by means of Senate Resolution 96, 91st Cong., 1st Sess., Congress referred Senate Bill 881 to the Chief Commissioner of the United States Court of Claims. That resolution required the court to:

[R]eport to the Senate, at the earliest practicable date, its findings of fact and conclusions thereon as shall be sufficient to inform the Congress (a) of the nature and character of his demand, as a claim legal or equitable, against the United States, (b) whether Commander Rawlins suffered non-promotion to the grade of captain as a probable consequence of any arbitrary, capricious, inadvertent, improper, inequitable, or wrongful act or action or combinations thereof by or within the Department of the Navy, and (c) in such event, the amount legally or equitably due from the United States to the claimant, notwithstanding the lapse of time and any statement of limitations or laches.

The chief commissioner assigned the case to a trial commissioner of the court, who conducted a trial and subsequently filed an opinion, findings of fact and conclusions of law. A review panel of three commissioners adopted the majority of the trial commissioner's opinion and his findings of fact. The review panel concluded that:

[A]n improper and inaccurate evaluation of plaintiff's performance of his duties during the period from April 20, 1942 to February 27, 1943, was responsible, at least principally, for the plaintiff's non-promotion to the grade of Captain * * *. (*Rawlins v. United States*, 197 Ct.Cl. 972, 1016 (1972)).

The review panel further concluded that the fact that the Navy failed to promote the plaintiff, a commander of better than average competency, to the grade of captain, when all the other commanders of average and better than average competency with whom he was in competition were promoted, was "unwarranted discrimination against the plaintiff that amounted to inequitable treatment of him by the Department of the Navy." *Id.* at 1016. The review panel informed the Senate:

(1) that Commander Edward White Rawlins, the plaintiff, has an equitable—but not a legal—claim against the United States, the defendant, (2) that the plaintiff suffered nonpromotion to the grade of captain as a probable consequence of improper and inequitable actions within Department of the Navy, and (3) that there is equitably due the plaintiff a retroactive promotion to the grade of captain on the active list of the Regular Navy as of July 1, 1947, and retroactive retirement in the grade as of July 1, 1951 (the date of the plaintiff's actual retirement).

*Id.* at 1017.

Congress responded with the introduction of more legislation designed to provide plaintiff his relief. Because of a House of Representatives rule precluding direct awards by Congress in military promotion cases, Congress enacted Private Law 95–60 which provides, in pertinent part:

[N]otwithstanding any statute of limitations pertaining to suits against the United States, or any lapse of time, or bars of laches, jurisdiction is hereby conferred upon the United States Court of Claims to hear, determine, and render judgment upon any claim of Commander Edward White Rawlins, United States Navy (retired) * * * arising out of his claim for retroactive active-duty pay and allowances and retirement pay due him as a result of nonpromotion to the grade of captain, such nonpromotion allegedly being the probable consequence of improper and inequitable actions within the Department of the Navy.

\*　　\*　　\*　　\*　　\*　　\*

Nothing in this Act shall be construed as an inference of liability on the part of the United States. Except as otherwise provided in this Act, proceedings for the determination of such claim and review and payment of any judgment or judgments on such claim shall be had in the same manner as in the case of claims over which such court has jurisdiction under Section 1491 of title 28 of the United States Code.

After plaintiff filed suit in this court pursuant to Private Law 95–60, the Government moved for dismissal of plaintiff's petition, arguing that this court is without jurisdiction to entertain plaintiff's claim. This court disagreed and, in the course of doing so, held that: (1) Private Law 95–60 authorized plaintiff's suit for back pay, but no claim for retroactive promotion; (2) Private Law 95–60 not only removed the procedural bars to plaintiff's suit but also created a new cause of action, the elements of which are plainly set forth in the statute, and (3) Rawlins need only show "in a formal hearing on the merits" that he was wrongfully denied promotion in order to be entitled to money damages. *Rawlins v. United States*, 225 Ct.Cl. ——, ——, 646 F.2d 459, 461–62 (1980). (Hereinafter referred to as *Rawlins I.*)

## II.

In his motion for summary judgment, plaintiff contends that the doctrine of collateral estoppel binds these parties to the findings of fact made by the trial commissioner and adopted by the review panel in the congressional reference proceeding. Under the doctrine of collateral estoppel, a final judgment in a prior suit precludes relitigation of issues actually litigated and necessary to the outcome of the first action. *Parklane Hosiery Co. v. Shore*, 439 U.S. 322, 326, n.5, 99 S.Ct. 645, 649, 58 L.Ed.2d 552 (1979). The defect in plaintiff's argument is, however, that here there has been no "final judgment" in a "prior suit." It is true that:

> Whenever any board, tribunal or person is by law vested with authority to judicially determine a question, such a determination, when it has become final, is as conclusive as though the adjudication had been made by a court of general jurisdiction. Freeman On Judgments, 5th Ed., Vol. II, § 633, p. 1335.

*Tidewater Oil Company v. Jackson*, 320 F.2d 157, 161 (10th Cir.), *cert. denied* 375 U.S. 942, 84 S.Ct. 347, 11 L.Ed.2d 273 (1963).

However, in a congressional reference proceeding, neither the trial commissioner nor the review panel is vested with such authority. A congressional reference proceeding is not the equivalent of a law suit, because the determinations of the panel do not result in a final judgment. Conclusions of law made by a congressional reference review panel are mere recommendations to Congress as to whether a plaintiff has presented equitable grounds for recovery. While Congress has, for the most part, agreed with review panel recommendations, it reserves the right to disagree.[1] Therefore, the findings and conclusions of the review panel have no collateral estoppel effect.

---

1. Glosser, *Congressional Reference Cases in the United States Court of Claims: A Historical Perspective*, 25 Am.U.L.Rev. 595, 627 (1976); Bennett, *Private Claims Acts and Congressional References*, 9 AF JAG L.Rev. (No. 6) 9, 14, n.17 (1967); *Montgomery v. United States*, 49 Ct.Cl. 574, 623, 626 (1914).

This is not to say that the evidence introduced at the congressional reference proceeding is of no value whatsoever. A congressional reference proceeding is indeed adversarial and there are many similarities between the procedures of congressional reference cases and those of cases within the general jurisdiction of this court.[2]

The parties have filed a "partial stipulation" of facts in which they have incorporated by reference the entire transcript of proceedings and exhibits in the congressional reference proceedings. While both parties reserved the right to submit additional proof at trial, both agreed at oral argument that no further factfinding is necessary in order for this court to render a decision on the merits. We are not bound by the facts or conclusions made by the congressional reference review panel, but we can make our own findings of fact based upon the stipulated facts and documents, reach our conclusions thereon, and apply the appropriate standard to determine the merits of Rawlins' claim.

## III.

The standard we must apply here was set forth by the terms of Private Law 95–60 itself. This court has jurisdiction to:

[H]ear, determine, and render judgment upon any claim of [plaintiff] * * * arising out of his claim for retroactive active-duty pay and allowances and retirement pay due him as a result of nonpromotion to the grade of captain, such nonpromotion allegedly being the probable consequence of improper and inequitable actions within the Department of the Navy * * *.

Thus, if plaintiff establishes that his nonpromotion to the rank of captain was the result of "improper and inequitable actions within the Department of the Navy," he is entitled to money damages. This was the holding of the prior panel of this court which considered defendant's motion to dismiss and we agree. *Rawlins I*, 225 Ct.Cl. at ——, 646 F.2d at 462.

Defendant has persistently argued to the contrary, and maintains that we should apply the legal standard normally applied in military promotion cases. *See Engels v. United States*, 678 F.2d 173 (Ct.Cl.1982); *Riley v. United States*, 221 Ct.Cl. 308, 608 F.2d 441 (1979); *Sanders v. United States*, 219 Ct.Cl. 285, 594 F.2d 804 (1979). Thus, defendant argues that plaintiff is required to show that there was prejudicial legal or factual error in the selection process, and that there exists a nexus between that error and his nonselection. *Riley, supra*, 221 Ct.Cl. at 312, 608 F.2d at 443.

We reject this contention on several grounds. First, it is the "uniform practice" of this court that one panel is bound by the decision of another; only the court *en banc* can overrule a decision of a prior panel. *Dravo Corp. v. United States*, 219 Ct.Cl. 416, 419, 594 F.2d 842, 843 (1979); *Lincoln Park Nursing Home v. United States*, 220 Ct.Cl. 626, 630, 618 F.2d 121 (1979). Defendant's motion for rehearing *en banc* pursuant to Rule 7(d) and for rehearing under Rule 151(b) was denied on February 6, 1981. The decision of this court in *Rawlins I* is the law of the case and defendant presents no convincing reason why we should not abide by that decision. *Gearinger v. United States*, 188 Ct.Cl. 512, 517, 412 F.2d 862, 865 (1969).

Furthermore, the use of the term "inequitable" in Private Law 95–60 indicates that this court is to go beyond the rules of law. *Rumley v. United States*, 169 Ct.Cl. 100, 106 (1965). A cause of action upon an equitable claim, which is what Private Law 95–60 has given the plaintiff here, is "one based upon the broad moral principles of right and justice and which arises under circumstances in which the conscience and honor of the sovereign dictate that plaintiff should be compensated." *Elmers v. United States*, 172 Ct.Cl. 226, 231 (1965).

Congress is not restricted to provide for the payment of legal obligations only. Its power "extends to the creation of such obligations in recognition of claims which are merely moral or honorary." *Pope v. United*

2. *Glosser, supra*, at 605, 607.

*States*, 323 U.S. 1, 9, 65 S.Ct. 16, 21, 89 L.Ed. 3 (1944). Private Law 95–60 imposes on the government "a new obligation where there had been none before." *Id.*

As the court held in *Rawlins I*, Congress has, by enacting Private Law 95–60, transformed what may have been a mere moral obligation into a legal right to recover money damages by showing that plaintiff was inequitably denied promotion to the rank of captain. There is nothing extraordinary about such congressional action, for as the Supreme Court observed in *Glidden Co. v. Zdanok*, 370 U.S. 530, 566, 82 S.Ct. 1459, 1480, 8 L.Ed.2d 671 (1962):

> Throughout its history the Court of Claims has frequently been given jurisdiction by special act to award recovery for breach of what would have been, on the part of an individual, at most a moral obligation.

### IV.

■ Defendant contends that because *Rawlins I* requires a "formal hearing on the merits," 225 Ct.Cl. at ——, 646 F.2d at 462 n.3, a trial *de novo* is required to decide this case. Again we disagree. Where the parties have stipulated to the introduction of the transcript and documents of the congressional reference proceeding and both parties have agreed that no further fact-finding is necessary, there is certainly no need to hold a trial. The parties' oral arguments and briefs in support of their cross-motions for summary judgment constitute the "formal hearing on the merits" required by *Rawlins I*. Thus we proceed to examine the record and documents presented to us by the parties to determine whether "improper and inequitable actions" by the Navy resulted in plaintiff's nonpromotion.

### V.

On the basis of the stipulated facts and documents, we make the following findings of fact, in addition to those set forth in section I above:

### A. *The 1939 Correspondence.*

On March 1, 1939, attorneys representing plaintiff's then wife wrote to the Navy Bureau of Supplies and Accounts stating that plaintiff and his wife had been separated since August 1936, and that plaintiff had not contributed to her support since that time. The attorneys inquired whether plaintiff had been receiving additional compensation from the Navy on the basis of his marital status. Plaintiff was directed by the Navy to submit a response to this letter and did so on April 18, 1939. Plaintiff's response explained the facts of his troubled marriage and contained a copy of a Florida court decree dismissing his wife's suit for divorce because "the equities of said cause are in the defendant [Rawlins] and not in the plaintiff [his wife] * * *." Plaintiff maintained that at no time during his marriage did he refuse to contribute to his wife's support and that his wife refused to live with him or accept any support from him.

It was not until June 1949 that plaintiff discovered that his letter of explanation, as well as a letter from his commanding officer attesting to the accuracy of the facts contained therein, were missing from his personnel file. These two documents were not located and placed in his file until January 1950. Thus, the uncontroverted facts are that the accusatory letter from plaintiff's wife's attorneys was in his file and available to all the selection panels and boards that considered him for promotion until 1950, unmitigated by his letter of explanation.

### B. *Plaintiff's Fitness Reports and Service Record.*

The record contains several fitness reports that Rawlins received while he held the rank of lieutenant commander, covering the period from March 18, 1939 to April 20, 1942. These reports clearly demonstrate that plaintiff was an officer of above average competency who was thought of highly by his superiors.

The fitness reports contain categories of duties in which the officers are ranked on a

scale of 0 to 4.0. Of the 25 numerical ratings plaintiff received in these fitness reports, 20 were at or above 3.8, the lowest of the 25 being a 3.5. All of the reports except the one immediately preceding his promotion to commander included explicit statements highly recommending Rawlins for promotion. The rating officers described Rawlins as "loyal, reliable and industrious" possessing "initiative, judgment and intelligence," "forceful and a good leader," "an outstanding officer" and "an officer of high moral integrity, intensely interested in his profession."

Plaintiff was promoted to the temporary rank of commander on July 17, 1942; on September 27, 1947, that promotion was made permanent, with the date of rank July 17, 1942.

Plaintiff's first fitness report following his promotion to commander was signed by Vice Admiral R. M. Brainard and covered the period April 21, 1942 to February 27, 1943. That report deviated from the pattern of his preceding reports. It described Rawlins as being an officer of "average capability, education and experience * * * conscientious and loyal; a cheerful and genial shipmate." Of the 13 rating categories on this report, plaintiff received six marks that were close to unsatisfactory, and in comparison with other officers of his rank and length of service plaintiff was designated "average." Plaintiff was rated 3.0 in his then assignment, 2.8 as executive or division officer, and 2.8 in administration (on a scale of 0 to 4.0).

Certain facts in the record, however, indicate that the Brainard fitness report was not an entirely fair or accurate portrayal of plaintiff's performance and his fitness for promotion. Captain (later Admiral) Robert B. Carney was the chief of staff to Admiral Brainard for a period ending September 30, 1942, and was in a position to directly observe plaintiff's performance during this time. Carney testified at the congressional reference hearing that plaintiff's performance of duty was excellent.

In 1947, Carney learned of Brainard's mediocre report on Rawlins and wrote to Brai-nard, informing him that Rawlins had never been promoted to captain even though other officers "who had far less to commend themselves" than Rawlins had been promoted. Carney suggested that if Brainard agreed that Rawlins was deserving of a promotion to captain, a letter to that effect to the Secretary of the Navy would be helpful to Rawlins' cause. In November 1948, Brainard wrote to the Secretary stating:

> I found Commander Rawlins to be of high personal and military character, bright, proficient in the technical and organizational phases of his specialty, genial and of pleasing personality, and, in my opinion, he appears fully deserving of favorable consideration for promotion to Captain, U. S. Navy.

Captain (later Rear Admiral) E. T. Wooldridge succeeded Carney as chief of staff to Admiral Brainard, and thus was also in a position to directly observe plaintiff's performance of his duties. Wooldridge wrote the Bureau of Naval Personnel in June 1947, stating that he considered Rawlins "ultraconscientious, bright and energetic, and of an extremely high and personal character." He further noted:

> I have no idea why [Rawlins] was not selected. However, [I] have seen quite a large number of Captains who were promoted who were not in my opinion the equal of Commander Rawlins in military attainment and personal characteristics. * * * I would, of course, appreciate it if you would give his request [for review and rectification of his failure of promotion to captain] in highest consideration * * *.

The two fitness reports plaintiff received following the Brainard report were completed by Rear Admiral D. M. Beary. Beary consistently gave plaintiff numerical ratings of 3.5 or above and very high marks in all areas, including intelligence, judgment, initiative, leadership, courage, loyalty, and cooperation. Beary described Rawlins as "most capable" and "above average" in comparison with other officers of his rank and length of service. Beary, how-

ever, failed to recommend Rawlins for promotion in either of these reports. The record establishes that selection panels and boards attach great weight to the existence and strength of such recommendations.

In 1949, plaintiff approached Vice Admiral F. C. Denebrink, formerly Beary's chief of staff, regarding Beary's failure to recommend plaintiff for promotion. Denebrink contacted Admiral Beary on the matter, and Beary responded with a letter to the Secretary of the Navy stating: "I considered [Rawlins] fit for promotion at the time [I wrote the fitness reports] and still do." Beary requested that the following sentence be added to both of his reports on Rawlins: "Well-fitted and strongly recommended for promotion to the rank of captain."

The fitness reports on Commander Rawlins that followed the Brainard and Beary reports reflect above average performance as the earlier reports had done. For instance, during the period from July 24, 1946 to June 27, 1947, plaintiff received four fitness reports signed by Captain Harley F. Cope. In each of these four reports, Cope "highly" or "strongly" recommended plaintiff for promotion and stated in each that, considering all officers of the same rank, he would promote Rawlins if only 10 percent of all eligible officers were to be promoted. In the majority of the 19 rating categories on the fitness report forms, Cope placed plaintiff in the top 10 percent of all officers of the same rank.

Further evidence of Rawlins' fine performance following the war is the five fitness reports signed by Captain C. L. Winecoff. In each of his reports, Winecoff stated he would promote Rawlins if only 10 percent of all officers of the same rank were to be promoted. He placed plaintiff in the top 10 percent category for the majority of the rating factors and strongly recommended him for promotion.

During his career, plaintiff received several awards and commendations. On July 9, 1944, Rawlins received a letter of commendation for "outstanding performance of duty as a member of the staff of Command-

er Fleet Operational Training Command" for the period from March 1943 through June 1944. By letter dated October 30, 1947, plaintiff was notified that he had been awarded the Bronze Star Medal for service from July 7, 1944 to July 2, 1945. Finally on March 25, 1948, the Secretary of the Navy approved the award to plaintiff of a letter of commendation for his services as a communications officer from December 7, 1941 to April 20, 1942.

C. *Plaintiff's Nonselection by the Wartime Panels, the 1945 Administrative Board, and the Statutory Selection Boards.*

During World War II, the provisions of the statute governing permanent promotion of Navy officers were suspended. A temporary promotion law was enacted in July 1941, which provided for panels of senior Navy officers in lieu of the formal selection boards. Under the temporary procedures, the Secretary of the Navy submitted to the members of these panels a list of names to be considered for temporary promotion to captain and a memorandum asking the member to select those officers he felt were so qualified. Overseas panel members did not have access to the records of the officers who were being considered. Under the panel system, members were allowed to serve on later panels considering officers for promotion to the same rank. Under the statutory selection procedures, officers under consideration were permitted to submit written communications to the board within 10 days after it convened, but no such communications were allowed under the wartime procedures.

In late 1943, plaintiff was considered, but not selected, by one such wartime promotion panel. Before the end of the war, Rawlins was again considered, but not selected, for promotion to the rank of captain by two more wartime promotion panels that convened from June to August 1944, and January to April 1945. In late 1945, Rawlins was again considered for promotion by an "administrative board" which convened in Washington, D. C. The board, which

consisted of 15 Regular Navy and Navy Reserve officers, considered 1,160 officers and selected 865 for promotion. Again, plaintiff was not selected.

Of course, the three wartime promotion panels and the administrative board did not have the benefit of the Brainard, Beary, and Wooldridge letters recommending plaintiff for promotion, because the letters were written after the panels and board had acted, nor were they aware of his award of the Bronze Star and his second letter of commendation.

Although the record is unclear on the point, it is possible that the second and third wartime panels and the administrative board may have been aware of the letter of commendation received by plaintiff on July 9, 1944.

The parties have stipulated that a total of 2,740 Navy commanders were considered for promotion to the grade of captain during World War II. Only 151 of the 2,740 were not selected.

#### D. *Plaintiff's Request to the Secretary of the Navy.*

Rawlins diligently continued his efforts to obtain a promotion to captain through various channels. On June 9, 1947, he wrote to the Secretary, reciting his record of 23 years of "unbroken commissioned service * * * unmarred by a single unsatisfactory fitness report, suspension from duty * * * or other disciplinary action." Rawlins requested that "steps be taken to restore him to the lineal position corresponding to [his] present permanent rank and the present permanent rank of [his] USNA class * * *."

Captain Harley F. Cope endorsed Rawlins' request stating that "he has consistently performed all assigned duties in an outstanding and highly exemplary manner," and that "since the billet he now occupies calls for an officer of captain's rank, Commander Rawlins, by his excellent performance of duty, has displayed all the necessary attributes of command required by such rank to prove that he is fully qualified to hold such rank." Cope "strongly recom-

mended" that Rawlins be promoted. As previously stated, Rear Admiral E. T. Wooldridge also wrote a letter to the Bureau of Naval Personnel on Rawlins' behalf. The Secretary denied plaintiff's request on July 16, 1947.

#### E. *Congressional Action.*

In September 1947, Rawlins requested permission to communicate with members of Congress regarding the denial of his request for promotion by the Secretary of the Navy; the Secretary granted him permission. Plaintiff then sought the assistance of Senator Millard F. Tydings, who contacted the Department of the Navy on plaintiff's behalf. The Secretary of the Navy responded to Senator Tydings by assuring him that the selection system was an equitable one, but that nothing more could be done for Commander Rawlins.

By letter dated December 20, 1948, Senator Tydings inquired of the Secretary of the Navy whether the Board for the Correction of Naval Records might review Rawlins' case. The Secretary replied:

> There are certain few established procedures which, by their peculiar nature, do not lend themselves readily to administrative or judicial review. * * * Findings made by duly constituted selection boards or panels would seem to fall within such category.

In early 1949, Senator Tydings introduced S. 780, a bill authorizing the President to promote Rawlins to captain retroactively to June 1, 1943, and to pay him the difference between the amount he did receive and that which he would have received had he been so promoted. The Senate Armed Services Committee favorably reported the bill, but amended it to provide that the Secretary of the Navy should appoint a board to review the records of all Regular Navy and Marine Corps officers who failed to be promoted from June 1942 to August 1947 for error or prejudicial injustice. This bill passed the Senate on July 6, 1949. A companion bill was introduced in the House of Representatives and hearings were held at which plain-

tiff and others testified. S. 780 was favorably reported by the House Armed Services Committee, but failed to pass the House.

In 1951, the Senate Judiciary Committee adopted and reported favorably an amendment to H.R.1181, 82d Congress. That amendment, similar to the amended version of S. 780, was never enacted into law.

In January 1955, another bill for plaintiff's relief was introduced in the Senate. A subcommittee of the Senate Armed Services Committee concluded, however, that "available evidence fails to establish an entitlement to promotion, either retroactively or prospectively" and recommended no further consideration of Rawlins' claim. These are examples of 22 legislative proposals to afford plaintiff relief.

On July 18, 1957, plaintiff filed an application with the Board for the Correction of Naval Records. The Board stated it would take no action on plaintiff's application.

In 1960, plaintiff approached Representative Carl Vinson, Chairman of the House Committee on Armed Services, regarding his case. By letter dated April 21, 1960, Representative Vinson suggested to the Secretary of the Navy that, because:

Legislation does not seem to be the appropriate method for handling this matter * * * [Rawlins'] case should be considered carefully by the Board for the Correction of Naval Records * * *.

The Secretary responded:

I am of the opinion that no useful purpose can be served by referring to the Board for the Correction of Naval Records, a board advisory in nature, a case in which I have personally reviewed the records, and finally after considerable deliberation, reached the conclusion that Commander Rawlins has suffered no injustice incident to his promotion failure under the war-time panel system.

In 1961, two resolutions for plaintiff's relief were introduced in the House of Representatives. On the morning in which hearings on the resolutions were scheduled to begin, plaintiff was contacted by Undersecretary of the Navy, Paul B. Fay, who told plaintiff that he was willing to convene a special advisory board of retired flag officers to examine plaintiff's record as it stood during the war, with the addition of plaintiff's letter of April 18, 1939. The board would then recommend whether plaintiff should have been promoted by any of the three wartime panels or the 1945 administrative board. Plaintiff accepted the proposal, because he felt that not to do so would antagonize the Undersecretary, the official who would act upon any recommendation made by the Board for the Correction of Naval Records. The House Committee about to hold hearings tabled the resolutions upon learning of plaintiff's agreement with Undersecretary Fay. Plaintiff was not allowed to appear before the special advisory board or call any witnesses. His request that additional materials be brought to the attention of the board was denied.

On September 19, 1961, plaintiff was advised by Undersecretary Fay that the special advisory board had concluded that plaintiff's promotion by any of the 1943–45 panels or boards "was not appropriate." The Undersecretary approved of the advisory board's recommendations and stated that he considered the matter closed.

## VI.

■ The foregoing facts lead to the conclusion that plaintiff's nonpromotion to the rank of captain was the "probable consequence of improper and inequitable actions within the Department of the Navy" in the following respects:

1. The presence in the plaintiff's file of the accusatory letter from the attorneys for his wife, plus the fact that his explanatory letter was not placed in his files until January 1950, probably hurt his chances for promotion. In fact, one Navy officer who was a member of the 1943 panel that considered plaintiff wrote him in 1955 stating that if it was assumed that he did not vote for plaintiff only because of the derogatory letter of the attorneys, he would have voted in favor of plaintiff's promotion if the explanation had been in the file.

2. The fitness report made by Admiral Brainard covering plaintiff's work for the period from April 20, 1942 to February 27, 1943, was a major factor in plaintiff's nonpromotion to the rank of captain. The report was an inaccurate and improper evaluation of plaintiff's performance as was clearly demonstrated by the evaluation by Admiral Carney, the letter written by Rear Admiral Wooldridge in June 1947, and the letter written by Admiral Brainard in November 1948.

3. Since plaintiff was an officer of better than average competence in comparison with other officers in his grade, the failure to promote him to the rank of captain when all of the wartime commanders of better than average competence were so promoted amounted to an unwarranted discrimination against plaintiff and an inequitable action by the Navy.

4. The refusal to permit plaintiff to appear before the special advisory board convened by the Undersecretary of the Navy, or to call any witnesses in his behalf, or submit any additional materials before the board, likewise constituted inequitable action by the Navy. As the review panel found, such action violated "that concept of a broad moral sense 'based upon general equitable consideration' long recognized and embodied in Section 2509. * * *" 197 Ct.Cl. at 986.

5. The failure of the Board for the Correction of Naval Records to consider plaintiff's case was a contributing factor to his nonpromotion to the rank of captain. If the board had considered his case and permitted him to supplement his record with the letters of commendation and awards referred to above, it is probable that plaintiff would have been able to support a claim of error or injustice in his record. Therefore, we agree with the conclusion of the review panel in the congressional reference case that the failure of the board to properly consider his case "contributed to a denial of rights accorded him by Section 207 of the Reorganization Act of 1946. * * *" 197 Ct.Cl. at 986.

Consequently, we hold that plaintiff is, as authorized by the terms of Private Law 95–60, entitled to recover the difference between the active duty pay he received as a commander and the pay he would have received if he had been promoted to the rank of captain on July 1, 1947. The record does not afford a basis for an exact determination of the date on which the Navy's inequitable treatment of plaintiff effectively prevented his promotion. Therefore, we adopt the view of the review panel in the congressional reference proceeding that the inequitable treatment had taken effect at least by July 1, 1947—the date S. 881 provided that plaintiff's retroactive promotion to captain was to become effective.

■ For the period from July 1, 1951, to the date of judgment, plaintiff is also entitled to recover the difference between the retired pay he received as a retired commander and the pay he would have received as a captain with 27 years of active commissioned service on the date of his retirement,[3] including any authorized increments, but less appropriate monthly payments required as a captain's contributions for such benefits as plaintiff has previously elected to provide for his survivors.

The Secretary of the Navy is directed to correct plaintiff's records to show that, from and after the date of judgment, plaintiff is entitled to receive the retired pay of a captain with 27 years of commissioned service, including any authorized increments, but less appropriate monthly payments required as a captain's contributions

**3.** We are aware of the Chief Commissioner's Supplemental Report to the United States Senate filed June 29, 1976 (Cong.Ref.No.1–69), which recommended that plaintiff is equitably entitled to be regarded as having served on active duty as captain from July 1, 1947, through June 30, 1955. (210 Ct.Cl. 672). However, since plaintiff voluntarily retired on July 1, 1951, we find that he is not equitably entitled to active duty pay when he was in retired status and provided no active duty service to the Navy during the 4 years following his retirement.

for such benefits as plaintiff has previously elected to provide for his survivors.[4]

■ Plaintiff's claim for prejudgment interest is rejected because Congress has not consented to such an award. *United States v. Mescalero Apache Tribe*, 207 Ct.Cl. 369, 518 F.2d 1309 (1975), *cert. denied* 425 U.S. 911, 96 S.Ct. 1506, 47 L.Ed.2d 761 (1976).

■ Plaintiff is not entitled to summary judgment on his claim for attorney's fees, because Private Law 95–60 does not authorize this court to award such fees. *Nibali v. United States*, 225 Ct.Cl. ——, ——, 634 F.2d 494, 496 (1980).

Plaintiff also seeks to recover court costs and attorney's fees under the provisions of the "Equal Access to Justice Act," Public Law 96–481, 94 Stat. 2325 (1980). Although the Act provides for a discretionary award of court costs (excluding attorney's fees and expenses) we have decided that we should not depart from our customary practice of declining to award court costs to either party.

■ We cannot consider plaintiff's claim for attorney's fees and other expenses under the Equal Access to Justice Act, because plaintiff has not filed the application that is required by the Act. See 28 U.S.C. § 2412(d)(1)(B). However, if after remand, plaintiff files an application which complies with the statute, the trial judge shall determine whether plaintiff is entitled to recover attorney's fees and expenses, and the amount thereof, if any.

## CONCLUSION

For the reasons stated above, plaintiff's motion for summary judgment is granted to the extent stated; defendant's cross-motion for summary judgment is denied, and the case is remanded to the Trial Division for further proceedings in accordance with this opinion.

4. Pursuant to 28 U.S.C. § 1491, the court has authority to correct pay records as an incident to the grant of monetary relief. *Airco Inc. v.*

NICHOLS, Judge, concurring:

I join in Senior Judge Cowen's opinion which deals very ably with the matters now before us. The only reason for writing anything separately is that the Act to be construed, Priv.L.No.95–60, 92 Stat. 3817 (1978), is a consent to be sued and as such it is subject to the doctrine of strict construction which defendant would have us apply. Our *Mitchell v. United States*, 229 Ct.Cl. ——, 664 F.2d 265 (1981), is not yet final, as it is pending in the Supreme Court on certiorari. I dissented, complaining that the court took strict construction too lightly. I do not wish it understood that I have abandoned or forgotten what I there said. I pointed out there that because of strict construction, Congress may intend to grant consent in a particular class of case, but fail to effectuate its intent through a technical drafting error that courts in other contexts would probably correct and apply as corrected. I pointed out *Hopkins v. United States*, 206 Ct.Cl. 303, 513 F.2d 1360 (1975), *rev'd*, 427 U.S. 123, 96 S.Ct. 2508, 49 L.Ed.2d 361 (1976), as a sad example. In that case, however, there was an unequivocal statutory consent to suits on contracts of certain nonappropriated fund agencies, leaving all suits not founded on contracts still barred. Congress was probably unaware—as are many able lawyers—that the federal employees who sue so commonly under 28 U.S.C. § 1491 do not do so for breach of their contracts of employment, except in unusual situations. If Senior Judge Skelton's dissent in *Rawlins I* (225 Ct.Cl. ——, ——, 646 F.2d 459, 462 (1980)), was correct, it was because some such error happened here. Defendant here makes a plausible argument that our panel majority in *Rawlins I* was wrong, arguing that the consent is limited to instances of unlawful nonpromotion such as we deal with under our regular jurisdiction, and waives only limitations. Since the point is jurisdictional, a prior holding such as that of our previous panel does not foreclose it.

*United States*, 214 Ct.Cl. 332, 340, 557 F.2d 237, 241 (1977). See also Rule 147(d).

I apply the doctrine of strict construction to Priv.L.No.95–60, as our former panel did not expressly do, or rather did so only in the context of a single not very relevant case, *United States v. Testan*, 424 U.S. 392, 96 S.Ct. 948, 47 L.Ed.2d 114 (1976). Judge Skelton, dissenting, would invoke this doctrine of strict construction to make the private law a nullity, as he could point to no reason for passing it unless to rid Congress for a season of Commander Rawlins' importunities. I do not think strict construction requires us to impute such heartless conduct to Congress, though Judge Skelton's position is nonfrivolous and perfectly tenable.

The private law refers to a "nonpromotion allegedly being the probable consequence of improper and inequitable actions within the Department of the Navy." It seems absurd to tell us to consider such actions only to determine we can do nothing about them. The words are given meaning by the fact that they echo the words of our chief commissioner, going on also to state there is "equitably due the plaintiff * * * a retroactive promotion to the grade of captain." 197 Ct.Cl. 972, 1017. Resort to the source of language Congress employed in enacting its consent, to give meaning to its otherwise ambiguous language, is far different from actually rewriting the congressional language to correct a technical mistake. The language is, however, unambiguous insofar as it calls for relief if the Navy's action was "inequitable." If, however, we had to look for a legal error, it could be found in the forced substitution of a "special advisory board," entirely nonstatutory in its operation, for the statutory Board for Correction of Naval Records, 10 U.S.C. § 1552, which should have considered the case and advised the Secretary. The latter was wholly in error in supposing that such board was not authorized by Congress to consider promotion passovers. See the chief commissioner's report, 197 Ct.Cl. at 983, 986. Moreover, the records assembled for the various selection boards that passed Rawlins over were illegal in that they did not fairly portray his record. *Weiss v. United States*, 187 Ct.Cl. 1, 408 F.2d 416 (1969).

The Congress clearly did not intend the private law to be a nullity, and it is a fair inference it was persuaded by the chief commissioner's recommendation and did not pass the bill introduced to relieve Commander Rawlins because, or largely because, it had denied itself the right to do this. It would be carrying strict construction into extremism to apply it against recovery here, though such a decision might have been salutary in inducing Congress to reconsider strict construction itself. I'd want to be sure of my law before voting to frustrate congressional intent for any purpose.